UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| SIERRA CLUB, INC., CLEAN ENERGY FUTURE OKLAHOMA, and EAST TEXAS SUB REGIONAL PLANNING COMMISSION, <br><br> Plaintiffs, <br><br> v. <br><br> LIEUTENANT GENERAL THOMAS P. BOSTICK (in his official capacity as Commanding General and Chief of Engineers of the U.S. Army Corps of Engineers), MAJOR GENERAL MICHAEL J. WALSH (in his official capacity as U.S. Army Commanding General for Civil and Emergency Operations), COLONEL MICHAEL TEAGUE, (in his official capacity as Tulsa District Commander of the U.S. Army Corps of Engineers), COLONEL CHRISTOPHER W. SALLESE, (in his official capacity as Galveston District Engineer of the U.S. Army Corps of Engineers), and UNITED STATES ARMY CORPS OF ENGINEERS, <br><br> Defendants. | ) **Case No. Civ.** <br> ) <br> ) **COMPLAINT FOR** <br> )**DECLARATORY AND** <br> )**INJUNCTIVE RELIEF AND** <br> )**PETITION FOR REVIEW OF** <br> )**AGENCY ACTION** <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## **NATURE OF THE CASE**

1.     This is an action for declaratory and injunctive relief challenging  the

Defendant United States Army Corps of Engineers' (the "Corps") improper issuance of

Nationwide Permit 12 ("NWP 12") for the dredge and fill of U.S. waters pursuant to

Section 404 of the Clean Water Act; and for the Corps' improper use of NWP 12 for the

Keystone Pipeline Gulf Coast Project, which is a proposed 485-mile tar sands crude oil

pipeline that would run from Cushing, Oklahoma to the Gulf Coast, and which involves more than a thousand water crossings and the permanent destruction of over 130 acres of high-quality forested wetlands.

2.      Contrary to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et. seq., the Corps' issuance of NWP 12 was arbitrary and capricious, an abuse of discretion or otherwise not in accordance with law because Section 404(e) of the Clean Water Act ("CWA") allows the Corps to issue general nationwide permits only "after notice and opportunity for public hearing, [for] any category of activities …[that] are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1). However, NWP 12 authorizes activities that will cause more than minimal adverse environmental effects. NWP 12 authorizes the construction of utility lines that would result in no more than 1/2-acre of loss of waters of the U.S., but it also allows linear utility lines such as crude oil pipelines to use NWP 12 repeatedly for each water crossing along a project's length.  There is no limit to the number of times a utility line can use NWP 12, nor is there a limit to the total number of acres of wetlands that a utility line can destroy. In addition, the Corps failed to take the required hard look at the environmental impacts of NWP 12, and its finding of no significant impacts and decision not to prepare an environmental impact statement for NWP 12, were contrary to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §4321  and the APA, 5 U.S.C. §706(2)(A).

3.      The Corps' issuance of NWP 12 violates the CWA, NEPA, and the APA in several other respects.  For example, the Corps issued NWP 12 without making a final "minimal environmental effects" determination; instead, it relies on Corps district engineers to make that determination on a case-by-case basis without any opportunity for public comment on that determination.  The Corps also determined that the permanent conversion of high-quality forested wetlands to scrub shrub wetlands does not count toward the ½ acre threshold of NWP 12, thus allowing unlimited deforestation in violation of 404(e)'s minimal effects provision.

4.      The result of NWP 12 is to allow the Corps to "piecemeal" large interstate pipeline projects like the Keystone Pipeline Gulf Coast Project (the "Project") into several hundred 1/2-acre "projects" so as to avoid the individual permit process under § 404 of the CWA, which would require public notice and comment and an analysis of the overall project's impacts and alternatives pursuant to NEPA and the CWA.  Under NWP 12, a major utility line would almost never require a comprehensive environmental review of the project's impacts.

5.       By using NWP 12 for the Project in lieu of the individual CWA §404 permit that should have been prepared for the project, the project has been partially authorized without any public notice or environmental review process.  Indeed, the project proponent, TransCanada, has submitted pre-construction notifications (PCNs) to three Corps districts for this project and the Corps has granted authorization in at least two of the three districts, which means TransCanada can begin construction immediately.

6.     Based on the above and the reasons set forth more fully below, Plaintiffs seek a declaration that NWP 12 is invalid and preliminary and permanent injunctions against the Project proceeding under NWP 12.

## JURISDICTION AND VENUE

7.     Jurisdiction exists under 28 U.S.C. § 1331 ("Federal question"); 28 U.S.C. §§ 2201-2202 ("Creation of remedy" and "Further relief" provisions establishing power to issue declaratory judgments in cases of actual controversy); and the APA, 5 U.S.C. §§ 701-06.

8.     Venue is appropriate in this judicial district and in this Court under 28 U.S.C. § 1391(e) because Defendants are a federal agency and officers thereof; a substantial part of the events or omissions giving rise to the claim occurred here; and/or a substantial part of the property that is the subject of the action is situated here. Namely, the Project is seeking to proceed under NWP 12, and would originate at the crude oil supply hub at or near the town of Cushing in Lincoln County, Oklahoma, which is situated within this judicial district. The Project is designed to transport crude oil from existing facilities at Cushing to the Texas Gulf Coast, and would involve approximately 30 to 40 crossings of waters of the U.S. in Lincoln County under NWP 12. TransCanada has announced that it plans to commence construction of the first phase of Project in Cushing, Oklahoma, so the water bodies that are the most imminently threatened by the Project are located in this judicial district.

# PARTIES

## Plaintiffs

9.     The Sierra Club was founded in 1892 and is the nation's oldest grass-roots environmental organization.  The Sierra Club is incorporated in California, and has its headquarters in San Francisco, California.   It has more than 700,000 members nationwide, including over 3,000 members in Oklahoma and over 22,000 members in Texas.  The Sierra Club has a chapter in Oklahoma called the Oklahoma Chapter and a chapter in Texas called the Lone Star Chapter.   The Sierra Club is dedicated to the protection and preservation of the natural and human environment, including but not limited to wetlands, rivers, streams, and forests.  The Sierra Club's purpose is to explore, enjoy and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; and to educate and enlist humanity to protect and restore the quality of the natural and human environments.

10.     The Sierra Club has members in Oklahoma and Texas whose real property, recreational, aesthetic, business and/or environmental interests have been, are being, and will be adversely affected by the Defendants actions as set forth herein.  The Sierra Club brings this action on behalf of itself and its members.

11.     The Sierra Club and its members monitor the use of waters of the U.S. and compliance with the law respecting these water bodies, educate their members and the public concerning the management of these water bodies, and advocate policies and practices that protect the natural value of these water bodies.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND PETITION FOR REVIEW OF AGENCY ACTION

12.    Sierra Club and its members will suffer concrete injury from the construction and operation of utility lines authorized under NWP 12 without public notice and without undergoing an individual permit review, including the Project at issue in this case that has already been partially authorized under NWP 12.   Members of the Sierra Club own property located directly on the route of the Project, through which TransCanada is actively seeking or has already acquired easements for the pipeline to cross. These members' use and enjoyment of their property would be diminished by the construction and operation of the Project.   Furthermore, Sierra Club's members use the waterways and surrounding areas that stand to be filled, deforested, and otherwise impacted by the construction and operation of the Project for recreation and business purposes such as wildlife and bird viewing, canoeing, fishing, guiding, camping, and photography.

13.    Clean Energy Future Oklahoma ("CEFOK") is a non-profit organization that was founded in March 2012 in response to the fact that the oil and gas industry was continuing to dominate the energy markets while depressing the ability of renewable energies to prosper and grow. CEFOK has approximately 20 members and is growing quickly.   CEFOK's purpose is to advance and advocate for a clean energy future for Oklahoma through the development of sustainable renewable energy sources such as wind, solar, geothermal and certain sustainable bio-fuels.   In order to achieve a sustainable energy future, CEFOK works to prevent increased development of fossil fuel resources that delay our clean energy future.   CEFOK also works to ensure oil and gas industry infrastructure projects, including pipelines, refineries, hydraulic fracturing

projects, and oil storage depots, are permitted only after the completion of a thorough environmental review including an analysis of their impacts on the development of clean energy technologies.  One of CEFOK's current priorities is to educate the public about the Project, its potential impacts on Oklahoma's water resources, and its connection to the environmental destruction and human health issues associated with tar sands extraction in Alberta, Canada, including impacts to First Nations communities.

14.    The East Texas Sub-Regional Planning Commission ("ETSRPC") is a political subdivision of the State of Texas that was formed in 2012 pursuant to Section 391 of the Texas Local Government Code, which allows municipalities to join together to establish commissions in order to improve the health, safety, and general welfare of their residents, and to plan for the future development of communities and regions in such a way as to promote healthful surroundings for family life in residential areas and preserve historical and cultural values. Tex. Loc. Gov't Code Ann. § 391.001, 391.003.  ETSRPC was formed by the towns of Reklaw, Gallatin, and Alto, which each lie in close proximity to the route of the Project. These three towns and their residents use and depend on lakes, rivers, wetlands, and other waterbodies that the Project will cross, and are concerned about the adverse impacts to those resources that would result from the construction and operation of the Project.  ETSRPC's volunteer firefighters would respond to a pipeline spill or accident, and the towns are concerned that the crews are not equipped to respond to such a situation.

15.    Sierra Club, ETSRPC, and CEFOK ("Plaintiffs") and their members and/or citizens are and will be injured as a result of the Defendants' authorization of NWP 12

and the Project in violation of the CWA, NEPA, and the APA, in that environmental consequences of the Defendants' actions include the authorization, construction and operation of the Project without the preparation of the appropriate project-specific environmental analyses required by NEPA and the CWA.  Plaintiffs and their members and/or citizens comment on proposals for individual CWA 404 permits, environmental assessments (EAs) and environmental impact statements (EISs), and rely on information and data contained in proposals for individual CWA 404 permits, EAs, and EISs to plan their activities, to prepare and inform their participation concerning agency actions affecting the water bodies, and to disseminate the information to their members/citizens and the general public for their information and use.  These activities are impaired by the lack of public notice or disclosure that occurs when projects seek to proceed under NWP 12, such as with the Project in this case, and by the lack of information on the impacts of such projects that would otherwise be available through an individual CWA 404 permit process.  Many of Plaintiffs and/or their members/citizens commented, attended public hearings, and otherwise remained actively involved the previously-proposed Keystone XL project, which was a tar sands crude pipeline that would run from the U.S./Canada border to the Gulf Coast including a segment that is now the Project, and would be similarly involved in any public review process for the Project should the Corps offer one.  The procedural and informational interests and organizational purposes of Plaintiffs and its members/citizens are and will be directly and irretrievably injured by the Defendants' failure to comply with the statutes and regulations cited in this Complaint.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND PETITION FOR REVIEW OF AGENCY ACTION

16.     Plaintiffs and their members/citizens have aesthetic, scientific, recreational, business, and property interests in the wetlands, river, streams, and other water bodies, as well as the areas in the immediate vicinity of those water bodies, which will be adversely impacted by projects proceeding under NWP 12, including but not limited to the proposed Project.  Plaintiffs and their members/citizens use, enjoy, and/or depend on the water bodies affected by NWP 12 for clean water, healthy forests and wetland ecosystems, presence of wildlife, and outdoor recreation and business activities of various kinds, including nature study, photography, commercial guiding, bird-watching, fishing, canoeing, hunting, backpacking, camping, solitude, and a variety of other activities.

17.     The Defendants' actions at issue in this case, *e.g.*, the authorization of the nationwide permits (including NWP 12 and the related definitions and general conditions) in violation of the CWA, NEPA, and APA pose a risk of harm and do cause harm to Plaintiffs' interests.

18.     Plaintiffs submitted written comments to the Corps in opposition to the issuance or reauthorization of the nationwide permits, including NWP 12.  Plaintiffs have exhausted their administrative remedies or have no administrative remedies for the matters raised herein.  The actions challenged in this complaint are final actions for purposes of review, and an actual, justiciable controversy exists between Plaintiffs and Defendants. Plaintiffs have standing for the claims made herein; and Plaintiffs have no adequate remedy at law.

## Defendants

19.     Defendant United States Army Corps of Engineers (the "Corps") is the federal agency charged with administering permits under § 404 of the CWA for discharge of dredged or fill material into the waters of the United States. The Corps is headquartered in Washington, D.C.   The Corps has district offices throughout the country, including in Tulsa, Oklahoma, Fort Worth, Texas, and Galveston, Texas.

20.     Lieutenant General Thomas P. Bostick is Commanding General and Chief of Engineers of the U.S. Army Corps of Engineers in Washington, D.C. and is designated to act for the Secretary of the Army.   Plaintiffs bring this action against Lieutenant General Bostick in his official capacity only. Lieutenant General Bostick is the federal officer personally responsible for compliance with any injunction that this Court issues.

21.     Defendant Major General Michael J. Walsh is Commanding General for Civil and Emergency Operations in the U.S. Army Corps of Engineers headquarters in Washington, D.C. Plaintiffs bring this action against Major General Walsh in his official capacity only.   Major General Walsh is the federal officer who signed the Decision Document for Nationwide Permit 12 which is the subject of this action.

22.     Colonel Michael Teague is the District Commander of the U.S. Army Corps of Engineers Tulsa District.   Plaintiffs bring this action against Colonel Teague in his official capacity only.  Colonel Teague is responsible for the Tulsa District's authorization of the Project under NWP 12, which is the subject of this action.

23.     Colonel Christopher W. Sallese is the District Engineer of the U.S. Army Corps of Engineers, Galveston District. Plaintiffs bring this action against Colonel

Sallese in his official capacity only.  Colonel Sallese is responsible for the Galveston

District's authorization of the Project under NWP 12, which is the subject of this action.

## LEGAL BACKGROUND

### The Clean Water Act

24.     The CWA was enacted by Congress in 1972 to "restore and maintain the

chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).

To achieve this goal, § 404 of the CWA prohibits the discharge of any pollutant,

including dredged spoil or other fill material, into navigable waters unless authorized by a

permit. Id. § 1344.

25.     Section 404 of the CWA gives the Corps primary responsibility for

permitting construction activities that involve dredge and fill of U.S. waters. 33 U.S.C. §

1344. The Corps oversees the § 404 permit process and must comply with guidelines

promulgated by the U.S. Environmental Protection Agency ("EPA"), which are

incorporated into the Corps' own regulations. Id. § 1344(b)(1); 33 C.F.R. §§ 320.4(b)(4)

(2010), 325.2(a)(6) (2010). The underlying intent behind the guidelines, known as the

404(b)(1) guidelines and set forth at 40 C.F.R. Part 230 subparts B through J, is that

dredged or fill material should not be discharged if it will result in an unacceptable

impact on the aquatic ecosystem. 40 C.F.R. § 230.1(c) (2010).

26.     The guidelines provide that no discharge of dredged or fill material shall be

permitted for an individual project: (1) if there is a practicable alternative to the proposed

discharge; (2) if the discharge causes or contributes to violations of applicable state water

quality standards; (3) if the discharge will cause or contribute to significant degradation

of the environment; and (4) unless all appropriate steps have been taken to minimize potential adverse impacts.   40 C.F.R. § 230.10 (2010). The Corps' regulations also require that destruction of wetlands is to be avoided to the extent practicable. 33 C.F.R. § 320.4(r) (2010).

27.    Public participation plays an important role in CWA permitting decisions. The CWA provides in its general policy section that "public participation in the development . . . of any . . . program established by the Administrator. . . under this chapter shall be provided for, encouraged, and assisted by the Administrator . . ." 33 U.S.C. § 1251(e). Section 404 states: "The Secretary may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a). The applicable Corps regulations state: "[A]ny person may request, in writing, ... that a public hearing be held .... Requests for a public hearing under this paragraph shall be granted, unless the district engineer determines that the issues raised are insubstantial or there is otherwise no valid interest to be served by a hearing." 33 C.F.R. § 327.4(b) (2010).

28.    When issuing an individual § 404 permit for a specific project, the Corps must comply with the requirements of the National Environmental Policy Act (NEPA), which are set forth below.

29.    An alternative to the individual permit process is the nationwide permit program.  Section 404(e) allows the Corps to, "after notice and opportunity for public hearing, issue general permits on a State, regional, or nationwide basis for any category of activities involving discharges of dredged or fill material if the Secretary determines

that the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1). The Corps has issued NWPs for 52 categories of activities, including  "Aids to Navigation" (NWP 1), "Survey Activities" (NWP 6), "and "Utility Lines" (NWP 12, which is at issue in this case).

30.    Prior to finalizing a NWP, the Corps must evaluate and publish potential individual and cumulative impacts of the category of activities to be regulated under the NWP, including "a precise description of the activities to be permitted under the General permit, explaining why they are sufficiently similar in nature and in environmental impact to warrant regulation under a single General permit." 40 C.F.R. § 230.7(b).  The evaluation also must predict cumulative effects by quantifying the number of individual discharge activities likely to be regulated under a General permit until its expiration…" § 230.7(b)(1),(2),(3).

31.    NWPs can last up to five years, at which point they must be reissued or left to expire. 33 U.S.C. § 1344(e)(2); see also 33 C.F.R. § 330.5. The previous NWPs, including NWP 12, were published on March 12, 2007, and expired on March 18, 2012. 72 Fed. Reg. 11092.

32.    Projects authorized by NWPs do not need individual section 404 permits and do not go through the more comprehensive and transparent site-specific environmental and public interest review that individual 404 permits require. 33 C.F.R. § 323.3(a).

33.     The Corps' regulations provide that two or more different NWPs can be combined to authorize a project, but that "the same NWP cannot be used more than once for a single and complete project." 33 C.F.R. § 330.6.

### The National Environmental Policy Act

34.     NEPA is our "basic national charter for" environmental protection. 40 C.F.R. § 1500.1. Among the statute's goals are to "insure that environmental information is available to public officials and citizens before decisions are made and actions are taken"; and to "help public officials make decisions that are based on [an] understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." Id. § 1500.1(b)-(c).

35.     To achieve these objectives, NEPA requires all agencies of the federal government to prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The EIS must describe, among other things: (1) the environmental impact of the proposed action, and (2) any adverse environmental effects that cannot be avoided should the proposal be implemented. Id. § 4332(2)(C)(i), (ii).30. The Council on Environmental Quality ("CEQ"), created by Congress to implement NEPA, has promulgated detailed regulations to assist federal agencies in complying with NEPA. 40 C.F.R. § 1500.3 (2010).

36.     To determine whether a proposed action significantly affects the environment, and whether an EIS is required, the lead federal agency first prepares an environmental assessment ("EA"). 40 C.F.R. § 1508.9 (2010).  An EA must provide

sufficient evidence and analysis to determine whether to prepare an EIS. *Id.* The lead agency must take a 'hard look' at the relevant environmental concerns and alternatives to the proposed action. *Id*.

37.   If the agency concludes in an EA that a project may have significant environmental impacts on the environment, then an EIS must be prepared.  40 C.F.R. § 1501.4 (2010). To determine whether a proposed action may significantly affect the environment, the agency must consider both the context and intensity of the proposed action, including whether the project will take place in "ecologically critical areas," and whether the project will affect endangered species. 40 C.F.R. § 1508.27 (a) and (b) (2010).

38.   NEPA also mandates that the lead agency consider "the degree to which the action is related to other actions . . . with cumulatively significant impacts . . ." 40 C.F.R. § 1508.27(b)(7) (2003).  NEPA defines the "cumulative impact" to mean "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."  40 C.F.R. § 1508.7 (2010).  A federal action will significantly affect the environment "if it is reasonable to anticipate a cumulatively significant impact on the environment.  Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts." 40 C.F.R. 1508.27(b)(7) (2010).

39.   If an EA concludes that there are no potentially significant impacts to the environment, the federal agency must provide a detailed statement of reasons why the

project's impacts are insignificant and issue a "finding of no significant impact" (FONSI).  40 C.F.R. § 1508.13 (2010).  If the agency issues an EA/FONSI, it must make a convincing case for a finding of no significant impact on the environment.

40.     The CEQ regulations require a give and take between an agency and members of the public.  *See* 40 C.F.R. §§ 1500.1(b) (2010) ("public scrutiny [is] essential"), § 1500.2(d) (2010) (the agency must "encourage and facilitate public involvement"), § 1506.6 (2010) (the agency must "[m]ake diligent efforts to involve the public" in preparing environmental documents, give "public notice of ... the availability of environmental documents so as to inform those persons ... who may be interested or affected," and "solicit appropriate information from the public.").  CEQ regulations require federal agencies to give the public as much information as is practicable, so that the public has a sufficient basis to address those areas that the agency must consider in preparing the Environmental Assessment.  40 C.F.R. § 1501.4 (2010).

### The Administrative Procedure Act

41.     The Administrative Procedure Act (APA), 5 U.S.C. §§ 701-06, provides for judicial review of agency actions such as those at issue here. A reviewing court shall hold unlawful and set aside any Corps actions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

## FACTS

## The Corps' Issuance of Nationwide Permit 12

42.    On February 16, 2011, the Corps published a proposal to reauthorize a set of NWPs with some modifications. 76 Fed. Reg. 9174 (Feb. 16, 2011). The Corps invited public comment for a period of 60-days, ending on April 18, 2011.  Id.

43.    The Sierra Club, along with numerous other organizations, submitted a comprehensive comment letter to the Corps on April 18, 2011 that outlined many deficiencies in the proposed set of NWPs, including violations of the CWA and NEPA.

44.    On February 21, 2012, the Corps issued the final rule reissuing 48 of the 49 previously-existing NWPs, general conditions, and definitions, with some modifications; and issuing two new NWPs, three new general conditions, and three new definitions.  77 Fed. Reg. 10184 (Feb. 21, 2012) (the "Final Rule").  The Corps also issued an Decision Document and Finding of No Significant Impact (FONSI) for NWP 12, dated February 12, 2012.

45.    The Final Rule is a major federal action pursuant to NEPA regulations and the APA, as it constitutes a rulemaking and/or approval of specific projects by permit.  40 C.F.R. § 1508.18; 5 U.S.C. § 551.

46.    One of the reissued nationwide permits is NWP 12, which authorizes "[a]ctivities required for the construction, maintenance, repair, and removal of utility lines and associated facilities [including oil pipelines] in waters of the United States, provided the activity does not result in the loss of greater than 1/2-acre of waters of the United States for each single and complete project." 77 Fed. Reg. 10271.  A utility line

cannot use compensatory mitigation to increase the ½-acre loss limitation contained in NWP 12.  77 Fed. Reg. 10285.

47.    NWP 12 also authorizes discharges into waters of the U.S. for the construction of related substation facilities, access roads, and overheard utility lines, "provided the [related] activity, in combination with all other activities included in one single and complete project, does not result in the loss of greater than 1/2-acre of waters of the United States." 77 Fed. Reg. 10272.

48.    The Final Rule also contains a set of general conditions and definitions that apply to all of the NWPs, including NWP 12. 77 Fed. Reg. 10184, 10288.  As such, any reference to "NWP 12" herein includes both NWP 12 itself and the definitions and general conditions that apply to NWP 12.

49.    Several provisions prevent multiple usage of NWPs on a single project. General condition 15 provides that "[t]he same NWP cannot be used more than once for the same single and complete project."  77 Fed. Reg. 10283.  General condition 28 states: "The use of more than one NWP for a single and complete project is prohibited, except when the acreage loss of waters of the United States authorized by the NWPs does not exceed the acreage limit of the NWP with the highest specified acreage limit."  77 Fed. Reg. 10286.

50.    The previous definition of "single and complete project" was amended, in that the definition is now separated into two separate definitions: "single and complete linear project" and "single and complete non-linear project."  77 Fed. Reg. 10184, 10195.

51.     The definition of "single and complete non-linear project" reads: "[T]he total project proposed or accomplished by one owner/developer or partnership or other association of owners/developers.  A single and complete non-linear project must have independent utility (see definition of 'independent utility'). Single and complete non-linear projects may not be 'piecemealed' to avoid the limits in an NWP authorization." 77 Fed. Reg. 10290.

52.     A project has independent utility "if it would be constructed absent the construction of other projects in the project area. Portions of a multi-phase project that depend upon other phases of the project do not have independent utility. Phases of a project that would be constructed even if the other phases were not built can be considered as separate single and complete projects with independent utility." 77 Fed. Reg. 10289.

53.     However, the definition of "single and complete linear project" reads: "that portion of the total linear project proposed or accomplished by one owner/developer or partnership or other association of owners/developers that includes all crossings of a single water of the United States (i.e., a single waterbody) at a specific location."  77 Fed. Reg. 10290.

54.     NWP 12 thus allows linear utility projects to use NWP 12 separately for each individual water crossing. There is no limit to the number of times a single linear utility line can use NWP 12, nor is there a limit to the number of acres of U.S. waters that can be lost.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND PETITION FOR REVIEW OF AGENCY ACTION

55.     NWP 12 contains no "independent utility" requirement for linear "single and complete projects."

56.     NWP 12 defines "loss of waters of the United States" as: "Waters of the United States that are permanently adversely affected by filling, flooding, excavation, or drainage because of the regulated activity. Permanent adverse effects include permanent discharges of dredged or fill material that change an aquatic area to dry land, increase the bottom elevation of a waterbody, or change the use of a waterbody. The acreage of loss of waters of the United States is a threshold measurement of the impact to jurisdictional waters for determining whether a project may qualify for a NWP; it is not a net threshold that is calculated after considering compensatory mitigation that may be used to offset losses of aquatic functions and services… Waters of the United States temporarily filled, flooded, excavated, or drained, but restored to pre-construction contours and elevations after construction, are not included in the measurement of loss of waters of the United States." 77 Fed. Reg. 10289.

57.     The NWP 12 Decision Document acknowledges that the construction of utility lines "may result in the loss or alteration of wetlands," and that impacts to forested wetlands will be permanent: "[I]mpacts to wetlands will be temporary, unless the site contains forested wetlands… Forested wetlands will not be allowed to grow back in the utility line right-of-way so that the utility line will not be damaged and can be easily maintained. Only shrubs and herbaceous plants will be allowed to grow in the right-of-way." Decision Document, at 29.

58.     However, the Decision Document then states that "mechanized landclearing of a forested wetland in a utility line right-of-way may only result in a conversion of wetland type, and not result in permanent loss of waters of the United States", and "[t]he conversion of a forested wetland to a scrub shrub wetland does not constitute a permanent loss of waters of the United States, and thus does not count towards the acreage limit, even though it may result in the permanent loss of certain functions, which may require compensatory mitigation." Decision Document, at 6-46.

59.     NWP 12 requires a permittee to submit a preconstruction notification (PCN) to the district engineer before commencing the activity if the project meets any one of seven criterion. Id. For example, a PCN is required if the activity involves mechanized land clearing in a forested wetland, or if the activity would result in the loss of greater than 1/10-acre of waters of the United States. Id. (NWP 12 also incorporates the PCN requirements contained in general condition 31).  If none of the seven criteria are met, a project proponent may commence with the activity under NWP 12 without notifying the Corps or the public. When a permittee submits a PCN, the district engineer (DE) will determine whether the PCN is complete and/or request any additional information from the permittee within 30 calendar days.  77 Fed. Reg. 10286. The permittee may commence with the activity if it either receives written approval from the DE or if 45 days have passed and the permittee has not received written notice from the DE. Id.

## TransCanada's Keystone XL Pipeline Project

60.     In September 2008, TransCanada Keystone Pipeline, LP ("TransCanada") submitted a Presidential Permit application to the Department of State ("DOS") pursuant to Executive Order 13337 for its proposed Keystone XL pipeline project ("Keystone XL").  The proposed 1,384 mile project was comprised of three sections, including the "Gulf Coast Segment" that would extend approximately 485 miles from the existing terminus of the Keystone pipeline system at Cushing, Oklahoma to Nederland, Texas. The project was designed to transport approximately 830,000 barrels per day of tar sands crude oil from Alberta to the Texas Gulf Coast.

61.     DOS acted as the lead agency in the Keystone XL NEPA process because Exec. Order 13337 requires DOS to determine whether the project "would serve the national interest."  The Corps elected to participate as a cooperating agency in the preparation of the EIS because the Keystone XL pipeline would have required a CWA § 404 permit(s) for hundreds of water crossings in five states.

62.     While DOS was conducting its environmental review and national interest determination, in the fall of 2011, TransCanada submitted Pre-construction Notifications (PCNs) to the Galveston, Fort Worth, and Tulsa District offices of the Corps, requesting construction of Keystone XL in U.S. waters be verified under NWP 12.  On or about October 21, 2011, the Corps sent EPA Region 6 a coordination notice describing the project and its water crossings in the Galveston District.

63.     On or about November 8, 2011, the EPA responded with a letter to Corps objecting to TransCanada's use of NWP 12 for Keystone XL and urging the Corps to use

the more comprehensive individual permit process. The letter explained: "of the 101 crossings that require preconstruction notification to the Corps, it appears that approximately 60 crossings of waters of the U.S. would each result in greater than a 1/2-acre loss of waters of the U.S., and would therefore not be eligible for authorization under NWP 12."

64.    The EPA took issue with one water crossing that would exceed the 1/2-acre loss limit and would invoke Texas Regional Condition 2(b)- Bald Cypress-Tupelo Swamps, and concluded:"[T]his individual crossing, and many others included in the PCN exceed the minimal effects threshold established in the current NWP 12, and in combination, the approximately 60 crossings would result in significant cumulative effects in the aquatic ecosystem."

65.    The EPA recommended that the Corps undergo a standard individual § 404 permit review that would "provide for completion of a public interest review, would allow for public participation, development of a complete alternatives analysis to assist in further avoidance and minimization of environmental impacts such as use of existing Rights of Way, development of a mitigation plan for remaining unavoidable impacts, and overall greater collaboration among the Corps, the resource agencies, and the public."

66.    Following widespread concern over the project's impacts, DOS announced in November of 2011 that it would delay a final decision on the Keystone XL application until it completed a further environmental review of the project's environmental impacts. DOS estimated that a final decision could be made as early as the first quarter of 2013.

67.     In November and December of 2011, each of the three Corps districts that had received PCNs for Keystone XL exercised their discretionary authority and suspended NWP 12 for all work and discharges associated with the Keystone XL application.

68.     In December of 2011, Congress passed the Temporary Payroll Tax Cut Continuation Act of 2011, which required the President to make a final decision on TransCanada's Presidential Permit application for Keystone XL within 60 days. In January, DOS recommended to President Obama that the application be denied, and the President concurred. DOS explained that it was committed to a transparent, thorough, and rigorous review of the project's impacts, and that it did not have sufficient time to obtain the necessary information to make a national interest determination within the 60-day deadline.

**TransCanada's Keystone Pipeline Gulf Coast Project**

69.     TransCanada has now broken the Keystone XL project into two parts in an effort to avoid a transparent environmental review of its southern segment.

70.     On or about February 27, 2012, TransCanada informed DOS that it planned to apply for a new Presidential Permit for the northern segment of Keystone XL, but that it would proceed with the southern segment of Keystone XL as a separate project and would begin construction as soon as it acquired all necessary federal, state, and local permits.

71.     TransCanada has now proposed the Keystone Gulf Coast Pipeline Project (the "Project"), which is substantially similar to Keystone XL's southern "Gulf Coast

Segment" in terms of project design, water crossings, and its proposed route between Cushing, Oklahoma, and Nederland, Texas.

72.     In late March or early April of 2012, TransCanada submitted a PCN for the Project to the Galveston District of the Army Corps of Engineers  ("Galveston PCN") as well as PCNs for the Project to the Fort Worth and Tulsa districts Offices of the Corps.

73.     Under the terms of NWP 12, there is no public notice requirement for the PCN submissions or the Corps' evaluation of the PCNs, nor is the Corps required to undergo a NEPA analysis.  The Corps has not formally announced TransCanada's PCN submissions for the Project. The Sierra Club and its affected members have had no opportunity to submit comments or otherwise become involved in the Corps' evaluation of the Project.

74.     Upon informal requests, Corps officials have refused to share the PCNs for the Project or their supporting documents with Plaintiffs or its members.  Instead, the Corps instructed Plaintiffs to file formal requests under the Freedom of Information Act ("FOIA"). Plaintiffs filed FOIA requests with the Tulsa, Galveston, and Fort Worth Corps district offices on April 17 and May 17, 2012 requesting the PCNs and related documents. Plaintiffs have received some responsive documents from the Galveston District, but have not received any responsive documents from the Tulsa or Fort Worth district offices.

75.     The Galveston PCN acknowledges that "the previously proposed Keystone XL Pipeline project [] included the facilities that now constitute the Gulf Coast Project," and states that the Project would consist of approximately 485 miles of 36-inch diameter

pipeline that would commence at the crude oil supply hub at Cushing, Oklahoma and terminate at Nederland, Texas. Once operational, the Project would have the nominal capacity to transport 830,000 barrels per day (bpd) of crude oil.

76.     The Galveston PCN revealed that the Project would require approximately 549 crossings of waters of the U.S. within the Galveston district. The Project would temporarily impact 81.27 acres of forested wetlands and result in the "permanent conversion" of 91.67 acres of forested wetlands to lesser-quality scrub shrub wetlands.

77.     On or about June 25, 2012, the Galveston district notified TransCanada of its decision that construction of the Project in U.S. waters meets the terms and conditions of NWP 12 and authorized the project under NWP 12. This decision was not made available to the public.

78.     On or about June 28, 2012, the Tulsa district notified TransCanada of its decision that construction of the Project in U.S. waters meets the terms and conditions of NWP 12 and authorized the project under NWP 12.  This decision was not made available to the public.

79.     The 45-day review period for the Fort Worth district has not expired. However, under NWP 12, TransCanada can begin construction 45 days after its PCN was deemed complete, or as soon as the Corps notifies TransCanada that the Project can proceed under NWP 12.  General Condition 31, 77 Fed. Reg. 10286. However, there has been no public notice of the beginning of the review period, and the Corps authorize the Project under NWP 12 at any time with no public notice, and TransCanada could begin construction immediately.

## **Environmental Impacts of the Gulf Coast Project**

80.     Upon information and belief, and based on the 2011 and 2012 PCNs obtained through FOIA, the Project's construction and operation would have significant adverse effects to the environment along the pipeline route.

81.     The Project would result in significant losses of important wetlands and other water bodies, including high quality forested wetlands that provide habitat for birds and wildlife.

82.     The Project would require a 110-foot-wide right of way to be cleared of trees and shrubs, graded, and permanently maintained along the 485-mile route.

83.     The Project would involve approximately 1,500 total water crossings in three Corps districts, approximately fifteen of which would use horizontal directional drilling (HDD) while the rest would use standard open cut techniques. With each standard open cut crossing, a trench would be dug to a minimum of seven feet.  The excavated materials from the trenches would either be stored on the banks of the waterways or in the waterways themselves before being placed over the installed pipeline.  With each HDD crossings, a channel would be drilled under the waterbody in which the pipeline would be placed.

84.     The Project would temporarily impact approximately 158.18 acres of forested wetlands, and permanently convert approximately 137.26 acres of forested wetlands to emergent and scrub-shrub wetlands.

85.     In the Galveston district alone, the Project would temporarily impact 81.27 acres of forested wetlands and permanently convert 91.67 acres of forested wetlands to emergent and scrub-shrub wetlands.

86.     The Project will require the construction of approximately 11 new pump stations, 47 new mainline valves, and a significant amount of electric transmission lines as well as permanent and temporary access roads.

87.     The Project would transport tar sands crude oil, also known as oil sands crude oil, diluted bitumen (Dilbit), or Western Canadian Sedimentary Basin (WCSB) crude oil.  Tar sands oil is an unconventional and environmentally destructive petroleum source that is mined from a mixture of sand, clay, water, and bitumen underlying the boreal forests of Alberta, Canada. The extraction and conversion of the tar sands to a synthetic crude oil requires the destruction of large areas of pristine forests, the use of significant energy and water resources, and the far greater amounts of air pollutants and greenhouse gases emissions than from conventional oil. Due to its highly viscous and corrosive qualities, tar sands crude oil must be pumped through pipelines at high temperatures and pressures that weaken the integrity of pipelines and increase the potential for leaks and spills.

88.     The Galveston PCN states that the *primary* purpose of the Project is to transport growing domestic crude oil production.  However, the Project is part of the formerly proposed Keystone XL pipeline, which was designed to transport primarily heavy WCSB crude oil from the tar sands of Alberta, Canada, to Gulf Coast refineries. The Project would be initially capable of transporting heavy WCSB crude oil from the

existing Keystone pipeline system to the Gulf Coast, and that capability would increase if the northern half of the Keystone XL pipeline is permitted and built.

89.     As compared to conventional crude oil, tar sands crude oil is heavier, more corrosive, and more viscous. As such, it is more difficult to clean up when released into the environment. Because tar sands crude oil sinks to the bottom of affected waterways, traditional cleanup methods such as skimmers are ineffective.  For example, a 2010 tar sands pipeline rupture in Kalamazoo, Michigan spilled over 800,000 gallons of tar sands crude oil.  The cleanup efforts are ongoing after 23 months, and so far have cost over $750 million.

90.     TransCanada's Keystone I pipeline, which also transports heavy WCSB crude oil, and/or its pump stations experienced 12-14 leaks or spills in its first year of operation.

91.     The NEPA analysis for NWP 12 did not analyze the potential impacts of tar sands crude oil spills on waterways or any other impacts associated with large linear utility lines that would use NWP 12 numerous times along a several hundred mile project.

## CLAIMS FOR RELIEF

## CLAIM I

### Nationwide Permit 12 Violates CWA 404(e), Applicable Regulations, and the APA by Authorizing Projects that will Individually and Cumulatively have more than Minimal Effects on the Environment

92.     Plaintiffs reallege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

93.     The CWA Section 404(e) allows the Corps to issue NWPs only for categories of projects that the Secretary determines "are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1).

94.     NWP 12 permits the construction of utility lines and associated facilities that do not result in the loss of greater than 1/2-acre of waters of the United States "for each single and complete project."  77 Fed. Reg. 10271.

95.     NWP 12 defines "single and complete linear project" as "that portion of the total linear project proposed or accomplished by one owner/developer or partnership or other association of owners/developers that includes all crossings of a single water of the United States *(i.e., a single waterbody) at a specific location*." 77 Fed. Reg. 10290 (emphasis added).

96.     The effect of this definition is to allow each water crossing along a linear utility project to be permitted under NWP 12 as its own "single and complete project." There is no limit to the number of times that a single linear utility project can use NWP 12, nor is there a maximum number of acres of waters of the U.S. that a linear project can destroy while still being authorized under NWP 12.  There is no "independent utility" requirement for linear "single and complete projects."

97.     The Decision Document for NWP 12 also states that "[t]he conversion of a forested wetland to a scrub shrub wetland does not constitute a permanent loss of waters of the United States, and thus does not count towards the acreage limit, even though it may result in the permanent loss of certain functions."   EA, at 6-7. This definition

effectively permits projects that will permanently deforest an unlimited number of acres of high-quality forested wetlands.

98.     Furthermore, neither NWP 12 nor the Decision Document include a precise and detailed description of the activities to be authorized under NWP 12, nor do they take a detailed, hard look at the risks and threats to the aquatic environment or the cumulative impacts associated with activities that would be authorized under the permit as required by 40 C.F.R. § 230.7.

99.     By allowing linear utility projects to use NWP 12 an unlimited number of times with unlimited acres of total wetlands fill and unlimited "conversion" of forested wetlands to scrub wetlands, NWP 12 authorizes projects that will have more than minimal individual and cumulative effects on the environment in violation of the CWA Section 404(e), 33 U.S.C. § 1344(e)(1), and applicable regulations.  NWP 12 is therefore arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law and must be set aside pursuant to the APA, 5 U.S.C. § 706(2)(A).

## CLAIM II

**NWP 12 Violates CWA 404(e) by Deferring its Minimal Effects Determination Until After the Opportunity for Public Participation has Ended**

100.     The CWA Section 404(e) provides, in relevant part, that the Corps "may, after notice and opportunity for public hearing, issue general permits on a State, regional, or nationwide basis . . . if the Secretary determines that the activities in such category . . . will cause only minimal adverse environmental effects when performed separately, and

will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e).

101.    Thus, Section 404(e) sets forth a clear order that the Corps must follow: first, it must define a category of activities and determine whether that category will have only minimal effects; second, the Corps must allow public comment on that determination; third, after the Corps has made its determination and allowed public comment, the Corps may issue the NWP.

102.    Rather than make a final determination that a category of activities will have only minimal individual and cumulative effects on the environment, as Section 404(e) requires, NWP 12 relies on the discretion of "division and district engineers" to ensure, on a project-by-project basis, that the activities will have no more than minimal effects.

103.    For example, the Federal Register announcement states: "[I]n response to pre-construction notifications for NWP 12 activities that are linear projects, district engineers will evaluate the cumulative effects of those linear projects on the aquatic environment when determining whether authorization by NWP is appropriate." 77 Fed. Reg. 10260; see also 77 Fed. Reg. 10287 ("In reviewing the PCN for the proposed activity, the district engineer will determine whether the activity authorized by the NWP will result in more than minimal individual or cumulative adverse environmental effects or may be contrary to the public interest."). Also, the Decision Document for NWP 12 states: "Although the terms and conditions for this NWP have been established at the national level to authorize *most activities* that have minimal individual and cumulative

adverse impacts on the aquatic environment, division and district engineers have the authority to impose case-specific conditions on an NWP authorization to ensure that the authorized activities will result in minimal individual and cumulative adverse effects… If the proposed activity will result in more than minimal adverse effects on the aquatic environment, then the district engineer will exercise discretionary authority and require an individual permit." Decision Document, at 13 (emphasis added).

104. The Decision Document and the Federal Register announcement make dozens of similar claims, demonstrating that NWP 12 improperly defers a final minimal environmental effects determination for the division and district engineers to make on a project-by-project basis, after the opportunity for public notice and comment has expired.

105. The Final Rule is arbitrary and capricious and violates 404(e), which requires the Secretary to make a final determination that the activities will have only minimal cumulative adverse environmental effects *before* it issues a general nationwide permit, and only *after* notice and opportunity for public hearing.

106. For the reasons set forth above, the Corps's promulgation of NWP 12 violated the CWA 404(e) and Corps regulations; and was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law, contrary to the APA, and must be set aside. 5 U.S.C. § 706(2)(A).

## CLAIM III

### Nationwide Permit 12 is Arbitrary and Capricious, an Abuse of Discretion, and Violates the APA

107.    Plaintiffs reallege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

**a)      NWP 12 is arbitrary and capricious and/or an abuse of discretion because it allows linear projects unlimited use of NWP 12 while not allowing the same for non-linear projects.**

108.    NWP 12 allows "piecemealing" of linear projects to avoid the 1/2-acre limit, but prohibits the "piecemealing" of non-linear projects.

109.    The definition of "single and complete non-linear project" reads, in pertinent part: "the total project proposed or accomplished by one owner/developer or partnership or other association of owners/developers."  77 Fed. Reg. 10290. For non-linear projects, a "single and complete project" must have independent utility, which means that "it would be constructed absent the construction of other projects in the project area. Portions of a multi-phase project that depend upon other phases of the project do not have independent utility. Phases of a project that would be constructed even if the other phases were not built can be considered as separate single and complete projects with independent utility." Id.

110.    The purpose of the independent utility requirement for non-linear projects is clear: "Single and complete non-linear projects may not be 'piecemealed' to avoid the limits in an NWP authorization." Id.

111.   As set forth above, however, "single and complete linear project" is defined as "that portion of the total linear project proposed or accomplished by one owner/developer or partnership or other association of owners/developers that includes all crossings of a single water of the United States (i.e., a single waterbody) *at a specific location*." 77 Fed. Reg. 10290 (emphasis added).   There is no independent utility requirement for single and complete linear projects.

112.   NWP 12 is arbitrary and capricious and an abuse of discretion and must be set aside pursuant to the APA, 5 U.S.C. §706(2)(A), because its definition of "single and complete linear project" contradicts the plain meaning of the term "single and complete project"; robs the 1/2-acre loss threshold of any meaning by allowing unlimited acreage loss; and allows linear projects to use NWP 12 an unlimited number of times without meeting the "independent utility" test while prohibiting the same for non-linear projects without any justification in NWP 12, the Decision Document, or the Federal Register announcement.

**b)   NWP 12 is arbitrary and capricious and/or an abuse of discretion because it determines that "conversion" of forested wetlands to scrub wetlands is not considered a loss of waters of the U.S.**

113.   The Final Rule defines "loss of waters of the United States" as waters that are "*permanently adversely affected by filling, flooding, excavation, or drainage because of the regulated activity.* Permanent adverse effects include permanent discharges of dredged or fill material that change an aquatic area to dry land, increase the bottom elevation of a waterbody, or change the use of a waterbody." 77 Fed. Reg. 10289 (emphasis added).

114.    The Decision Document acknowledges that the "conversion" of forested wetlands to lesser quality scrub wetlands "may result in the permanent loss of certain functions." EA, at 6-7.

115.    The Decision Document acknowledges that impacts to forested wetlands in utility rights of way will be permanent: "Forested wetlands will not be allowed to grow back in the utility line right-of-way so that the utility line will not be damaged and can be easily maintained. Only shrubs and herbaceous plants will be allowed to grow in the right-of-way." Decision Document, at 29.

116.    Therefore, the conversion of forested wetlands to non-forested wetlands fits within NWP 12's definition of "loss of waters of the United States" because it results in permanent adverse impacts to wetlands.

117.    The Decision Document, however, states that "landclearing of a forested wetland in a utility line right-of-way may only result in a conversion of wetland type, and not result in permanent loss of waters of the United States", and "[t]he conversion of a forested wetland to a scrub shrub wetland does not constitute a permanent loss of waters of the United States, and thus does not count towards the acreage limit, even though it may result in the permanent loss of certain functions, which may require compensatory mitigation." Decision Document, at 6-7.

118.    The Decision Document's statement that permanent conversion of forested wetlands to non-forested wetlands is not a permanent loss of waters of the U.S. is not explained or justified, and is internally inconsistent because it contradicts its own

definition of "loss of waters of the U.S."   Therefore, it is arbitrary and capricious and must be set aside pursuant to the APA, 5 U.S.C. §706(2)(A).

     c)    **The Corps' determination that inter-agency coordination is not required for linear projects is arbitrary and capricious.**

119.    General Condition 31(d)(2) requires inter-agency coordination on "all NWP activities that require pre-construction notification and result in the loss of greater than 1/2-acre of waters of the United States."

120.    However, in discussing the applicability of General Condition 31 to NWP 12, the Corps states: "[D]istrict engineers will evaluate the cumulative effects of those linear projects on the aquatic environment when determining whether authorization by NWP is appropriate. *We do not believe it is necessary to require agency coordination for those linear projects.*" 77 Fed. Reg. 10260 (emphasis added).

121.    The Corps' determination that it believes agency coordination is unnecessary for linear projects is inconsistent with General Condition 31, and is not explained or supported.  As such, it is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law and must be set aside pursuant to the APA, 5 U.S.C. §706(2)(A).

## CLAIM IV

### The Corps' Promulgation of the Final Rule was Contrary to NEPA, Applicable Regulations, and the APA

122.    Plaintiffs reallege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

123.   The Corps prepared a "Decision Document" for NWP 12, which was signed by Defendant Michael Walsh on February 13, 2012.  Among the purposes of this Decision Document was compliance with NEPA.

124.   The Decision Document included a FONSI at section 7.1.  Based on this FONSI, the Corps did not prepare an EIS for NWP 12.

125.   The Corps violated NEPA and its implementing regulations, 40 C.F.R. § 1500.1, *et seq.*, and the APA because it failed to take a "hard look" at the environmental impacts of NWP 12. The purpose of the "hard look" requirement under NEPA is to ensure the agency has detailed information about significant environmental impacts before it makes a decision, and to ensure that the information is available to the public. However, the Corps failed to comply with NEPA's "hard look" requirement, and its finding of no significant impact was arbitrary and capricious, for numerous reasons, including but not limited to the following:

a) The Corps' Decision Document contains no analysis of, or basis for, its conclusion that impacts below 1/2 -acre of fill are minimal, and in fact there is no indication of how the Corps arrived at the 1/2- acre limit for utility lines; in fact, other NWPs have a lower maximum threshold acreage of 1/3 acre;

b) there was no consideration of different types of waters or wetlands to be impacted;

c) there was no analysis of wetlands functions or how they will be impacted by ½-acres of utility lines;

d) there was no analysis of the impacts of subsurface crossings on hydrology, hydrogeology, stability or interaction of surface water and groundwater;

e) there are no details or documentation to establish that conversion of forested wetlands to scrub or shrub wetlands is not a permanent loss, particularly while the Corps found that it is a "permanent loss of certain functions";

f) there is no analysis of harms from utility lines as distinct from other uses, e.g. while NWP 12 would authorize cross-country oil pipelines with unlimited water crossings there is no mention of impacts from potential oil spills;

g) there is no analysis of how many times or where the permit may be used in one watershed or the impacts of multiple use of the permit in one watershed;

h)  there is no basis for the conclusion that NWP 12 is a minor contributor to wetlands loss, since that conclusion was based not on the impacts of NWP 12 itself but only relative to other contributors; and

i)  The Corps' "impact analysis" does not contain an analysis of impacts, but rather leaves that for subsequent case-by-case analysis with the submission of PCNs.

126.   The Corps further violated NEPA and its implementing regulations, 40 C.F.R. § 1500.1, *et seq.*, and the APA because it failed to conduct an adequate analysis of all reasonable or practicable alternatives to NWP 12. For example, the Decision Document does not consider the alternative of removing the distinction between linear and non-linear projects; and it does not consider the alternative of reducing the 1/2-acre threshold to a lower number.

127.    The Corps further violated NEPA and its implementing regulations, 40 C.F.R. § 1500.1, *et seq.*, and the APA because it failed to analyze adequately the direct, indirect, and cumulative impacts of NWP 12.  For example, the Decision Document does not consider the impacts associated with large utility projects using NWP 12 numerous times, such as oil pipelines; the cumulative impacts of the loss of forested wetlands associated with construction of such pipelines; and the effects of multiple uses of NWP 12 within particular watersheds, including impacts of past, future, and crude oil pipelines.

128.  The Corps' FONSI also violated NEPA and its implementing regulations, 40 C.F.R. § 1500.1, *et seq.*, and the APA. The FONSI consists of only two sentences. It is totally conclusory.  The reason for finding the impacts of the permit are allegedly not significant is not explained in the FONSI.  Therefore, the FONSI is contrary to 40 C.F.R. § 1508.13 and is arbitrary and capricious.

129.  In fact, the Final Rule is "significant" as that term is defined in 40 C.F.R. § 1508.27. Therefore, the Corps was required to perform an environmental impact statement.  Its failure to do so is contrary to NEPA, 42 U.S.C. § 4332(2)(C), and its implementing regulations including but not limited to 40 C.F.R. §§ 1501.3, 1501.4, 1502.4, 1508.9, 1508.11, 1508.18 and 1508.27.

130.    In sum, for the reasons set forth above,  the Defendant's NEPA analysis, FONSI and decision to issue the permit failed to comply with NEPA and its implementing regulations and was arbitrary, capricious, and not in accordance with the law, and violated the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

## CLAIM V

### The Corps' Authorization of the Project Violates
### CWA 404(e), NEPA, and the APA

131.   Plaintiffs reallege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

132.   On or about June 25 and June 28, 2012, respectively, the Galveston and Tulsa districts notified TransCanada that construction of the Project in U.S. waters meets the terms and conditions of NWP 12 and that the Project was authorized to proceed under NWP 12.

133.   The Galveston and Tulsa district's authorization of the Project under NWP 12  are final agency actions for which there are no other adequate remedy in a court, and are therefore subject to judicial review pursuant to the APA,  5 U.S.C. § 704.

134.   Based on the information contained in the Galveston PCN, dozens of the Project's individual crossings would result in the loss of more than 1/2 -acre of waters of the U.S., and several of the individual crossings in the Galveston district would each result in the loss of over ten acres of waters of the U.S.

135.   Based on the information contained in the Galveston (2012) and Tulsa (2011) PCNs, the Project would have more than minimal individual and cumulative environmental effects when measured crossing-by-crossing, watershed-wide, pipeline-wide, and region-wide. Many of the most destructive water crossings are concentrated in close proximity to each other in the same watershed. For example, the Galveston PCN indicates that the pipeline would permanently destroy over 60 acres of forested wetlands

in the Texas' Pine Island Bayou alone.   The Project would result in the permanent destruction of approximately 91.67 acres of forested wetlands in the Galveston district and over 130 acres along the Project's length.

136.   As such, the Corps' approval of the Project in the Galveston and Tulsa districts violates CWA 404(e) because the Project would individually and cumulatively have more than minimal environment effects.

137.   The Corps' authorization of the Project in the Galveston and Tulsa districts violates the inter-agency coordination requirements of NWP 12.   General Condition 31(d)(2) requires coordination with other resource agencies, including the EPA, on "all NWP activities that require pre-construction notification and result in the loss of greater than 1⁄2-acre of waters of the United States."   The Project requires PCNs for hundreds of water crossings, and the Project would result in the loss of greater than 1⁄2-acre of waters of the U.S.

138.   As set forth above, the Corps coordinated with EPA on TransCanada's 2011 PCNs, and the EPA objected to the use of NWP 12 because the project would have more than minimal environmental effects.   This time around, the Corps did not even offer EPA and other resource agencies the opportunity to coordinate and/or comment on the PCNs before approving the Project under NWP 12.   Thus, the Corps' authorizations of the Project violate General Condition 31(d)(2).

139.   As EPA stated in its 2011 objection letter, and as set forth above, the Project is ineligible for authorization under NWP 12 and the Corps' authorization of the Project under NWP 12 was improper.   Instead, the Corps is required to issue an

individual CWA § 404 permit for the Project pursuant to 33 U.S.C. § 1344(a) before the Project can proceed.

140.   Because the Project is ineligible for authorization under NWP 12, the Corps cannot rely on the Decision Document for NWP 12 issued on February 12, 2012 to satisfy its obligations under NEPA.  The Corps' authorization of this significant tar sands pipeline project was a "major Federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Therefore, the Corps was required to prepare an EA/FONSI or an EIS pursuant to 40 C.F.R. § 1508.9 (2010) and/or 40 C.F.R. § 1501.4.  The Corps failure to do so constitutes a violation of NEPA.

141.   For the reasons set forth above, the Corps' authorization of the Project under NWP 12 is therefore arbitrary and capricious and not in accordance with law and must be set aside pursuant to the APA, 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request this Court to find for Plaintiffs and to enter a judgment:

a)   Declaring the Corps's authorization of NWP 12 null and void and in violation of the Administrative Procedure Act, the Clean Water Act, and the National Environmental Policy Act;

b)   Vacating any Corps' authorizations of the Project under NWP 12 and issuing preliminary and permanent injunctions enjoining TransCanada from conducting any activities in reliance on those authorizations, including but not limited to any ground disturbance, excavation, dredging, filling, or

other alterations of waters of the United States, and enjoining the Corps

from further approving or authorizing the Keystone Pipeline Gulf Coast

Project under NWP 12;

c)   Awarding Plaintiffs their costs, expenses and attorneys' fees under the

Equal Access to Justice Act, 28 U.S.C. § 2412, and other applicable law;

and

d)   Providing for such other relief as the Court deems just and appropriate.

DATED:  June 29, 2012              Respectfully submitted,

s/ G. Steven Stidham

G. STEVEN STIDHAM, OBA No. 8633
Sneed Lang Herrold
1700 Williams Center Tower I
One West Third Street
Tulsa, OK  74103-3522
Telephone:       (918) 588-1313
Facsimile:        (918) 588-1314

DOUGLAS HAYES, Colo. Bar No. 39216
ERIC E. HUBER, Colo. Bar No. 40664
SIERRA CLUB
1650 38th Street, Suite 102W
Boulder, Colorado 80301
Telephone:  (303) 449-5595
Facsimile:  (303) 449-6520

DEVORAH ANCEL, Cal. Bar No. 261038
SIERRA CLUB
85 Second Street, 2nd Floor
San Francisco, CA 94105
Telephone: (415) 977-5709
Facsimile:  (415) 977-5793

Attorneys for Plaintiffs

44