**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **SIERRA CLUB, INC., CLEAN ENERGY FUTURE OKLAHOMA, and EAST TEXAS SUB REGIONAL PLANNING COMMISSION,** )<br>)<br>)<br>) | |
| **Plaintiffs,** ) | |
| ) | |
| v. ) | **CASE NO CIV-12-742-R** |
| )<br>) | |
| **LIEUTENANT GENERAL THOMAS P. BOSTICK (in his official capacity as Commanding General and Chief of Engineers of the U.S. Army Corps of Engineers, et al.,** )<br>)<br>)<br>)<br>)<br>) | |
| ) | |
| **Defendants**, ) | |
| ) | |
| **TRANSCANADA KEYSTONE PIPELINE, LP, a Delaware limited partnership, and TRANSCANADA CORPORATION, a Canadian public company, et al.,** )<br>)<br>)<br>) | |
| ) | |
| **Intervenors.** ) | |

**ORDER**

This matter comes before the Court on the Motion for Temporary Restraining Order and Preliminary Injunction, filed by Plaintiffs Sierra Club, Clean Energy Future Oklahoma, and East Texas Regional Planning Commission [Doc. No. 21], pursuant to Federal Rule of Civil Procedure 65(a). Defendants and the TransCanada Intervenors responded in opposition to the motion. The Court conducted a hearing on August 3, 2012, and having considered the parties' submissions, the Court finds as follows.

After the original request to complete the Keystone XL pipeline was denied by President Obama in 2011, TransCanada sought to divide its original intercontinental pipeline into segments. To that end, it submitted preconstruction notification to three district offices of the Corps. TransCanada sought verification that its projects fell within the scope of NWP 12, which authorizes the construction, maintenance, repair and removal of utility lines and assorted facilities, which includes pipelines. Each of the regional offices of the Corps granted the requested verification. Plaintiffs challenge NWP 12 on its face as violative of the Clean Water Act (CWA) and the National Environmental Policy Act (NEPA), arguing that the Corps violated the Administrative Procedures Act (APA) in reissuance of NWP 12 in March, 2012. Plaintiffs further contend the verifications issued by the Corps to TransCanada were improper. They seek to enjoin the start of construction of the pipeline, slated to begin on August 6, 2012, arguing that permitting the commencement of construction will result in irreparable injury.

> To obtain a preliminary injunction under Fed.R.Civ.P. 65(a), the moving party bears the burden of showing (1) the injunction, if issued, would not adversely affect the public interest, (2) irreparable harm would occur unless the injunction issues, (3) the threatened injury outweighs any harm an injunction may cause the opposing party, and (4) the party has a substantial likelihood of success on the merits.

*American Civil Liberties Union v. Johnson*, 194 F.3d 1149, 1155 (10th Cir. 1999). The Tenth Circuit has made it clear that "because a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009). The court may require a party

seeking a temporary restraining order or preliminary injunction to post a bond or otherwise give security "in an amount the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed.R.Civ.P. 65(c). Plaintiffs contend that bond is not required, where, as here, the injunction sought is alleged to be in the public interest. The Court finds Plaintiffs have failed to establish their right to this extraordinary relief because they have failed to establish a substantial likelihood of success on the merits, and thus the injunction is denied.

TransCanada's construction of the Keystone pipeline will admittedly involve the disturbance of wetlands, calling the Clean Water Act into play. The CWA prohibits a party from discharging pollutants, such as dredged or fill material, into waters of the United States. Under the Act, however, the Army Corps is authorized to allow discharges through the issuance of permits, both general and individual. 33 U.S.C. § 1344. The purpose of general permits, including Nationwide Permit 12 ("NWP 12"), issued pursuant to Section 404(e) of the CWA, is to permit projects that cause minimal environmental impact to proceed with little delay or paperwork. 33 C.F.R. § 330.1(b) (explaining that general permits are "designed to regulate with little, if any, delay or paperwork certain activities having minimal impacts"). If a proposed activity meets the conditions for general permits, the applicant need not subject the project to the individualized permit process through which the Corps makes determinations on discharges at specified disposal sites. 33 U.S.C. § 1344(a). The CWA requires that before the Corps issues a general permit, it must conclude that "the activities in [the general permit's] category are similar in nature, will cause only minimal adverse

environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1).

When issuing a nationwide permit the Corps must also comply with NEPA. NEPA is designed to "promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321. NEPA achieves this purpose by imposing procedural requirements that an agency must follow before taking action. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). NEPA, however, does not mandate particular results; it requires agencies to take a "hard look" at the environmental consequences of an action. *National Audubon Society v. Department of Navy*, 422 F.3d 174, 184 (4th Cir. 2005). Agency action that produces adverse environmental effects can still be NEPA-compliant so long as the agency has considered the adverse effects and determined that competing policy values outweigh those effects. *Id*. "[T]he only role for a court is to insure that the agency has considered the environmental consequences; it cannot interject itself within the area of discretion of the [agency]. . . ." *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980) (internal quotation marks and citations omitted).

Defendant contends NWP 12 violates both the CWA and NEPA, entitling it to enjoin the commencement of construction. The Court's review of NWP 12 is governed by the Administrative Procedures Act, 5 U.S.C. § 706(2)(A), which grants jurisdiction to a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions

found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* The Court must consider whether the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)). Agency action is arbitrary and capricious where the agency relied on factors that Congress did not intend it to consider, failed to consider an essential facet of the problem, gave a rationale for its decision that runs counter to the evidence before it, or is so unconvincing that it could not simply be a difference in view or the product of agency expertise. *Id.* The Court's review is highly deferential, and it may not substitute its judgment for that of the agency. While the Court "may not supply a reasoned basis for the agency's action that the agency itself has not given," it may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc.*, 463 U.S. at 43, 103 S.Ct. 2856 (citations omitted).

>NWP 12 permits:
>
>Activities required for the construction, maintenance, repair, and removal of utility lines and associated facilities in waters of the United States, provided the activity does not result in the loss of greater than 1/2-acre of waters of the United States for each single and complete project.

Plaintiffs first argue that NWP 12 permits "piecemealing" of projects by virtue of the definition of "single and complete project," which it contends is impermissible under the CWA.[1]

> The term "single and complete project" is defined as that portion of the total linear project proposed or accomplished by one owner/developer or partnership or other association of owners/developers that includes all crossings of a single water of the United States (i.e., a single waterbody) at a specific location.

77 Fed.Reg. at 10290. Plaintiffs contend this definition permits unlimited total loss of waters of the United States, and therefore, permits projects with more than minimal adverse environmental effects, contrary to the § 404(e) of the Clean Water Act. The Court concurs with Defendants that the Corps' interpretation is based on a permissible construction of the CWA and NWP 12 accounts for the potential cumulative impact of a linear project. Specifically, "[e]ach separate and distant crossing should be evaluated to determine if it meets the terms and conditions of the NWP, and cumulative effects of the overall utility line should be evaluated to determine if the adverse cumulative effects on the aquatic environment are more than minimal and therefore do not qualify for NWP authorization." 77 Fed. Reg. at 10196.

The Court rejects Plaintiffs' contention that the definition is arbitrary and capricious because it contradicts the ordinary meanings of the words "single" and "complete." As noted

---

[1] Plaintiffs also complain about the Corps' alleged failure to adequately explain the differences in treatment between linear and non-linear projects. The Corps, however, sufficiently identified that non-linear projects, such as a substation, fulfills its purpose at a single site. Plaintiff fails to establish that the independent utility test, which applies only to non-linear projects, was unreasonable or that the different in the impact of a linear versus non-linear project, is insufficient to account for the differing treatment thereof.

by the Corps, it is entitled to deference in its interpretations of its own regulations and the interpretation is not unreasonable.

Plaintiffs challenge Defendants' determination that conversion of a forested wetland to another type of wetland, i.e. scrub wetland, is not a "loss of waters of the United States." 77 Fed. Reg. at 10289 defines "loss of waters of the United States" as:

> Waters of the United States that are permanently adversely affected by filling, flooding, excavation, or drainage because of the regulated activity. Permanent adverse effects include permanent discharges of dredged or fill material that change an aquatic area to dry land, increase the bottom elevation of a waterbody, or change the use of a waterbody.

Defendants' interpretation of the conversion from forested wetland to another type of wetland, which does not change the use of a body of water, is not arbitrary and capricious.

Plaintiffs next contend the Corps' determination that inter-agency coordination is not required for linear projects, such as the Keystone Pipeline, is arbitrary and capricious. General Condition 31(d)(2) provides:

> For all NWP activities that require pre-construction notification and result in the loss of greater than 1/2-acre of waters of the United States . . . the district engineer will immediately provide (e.g., via email, facsimile transmission, overnight mail, or other expeditious manner) a copy of the complete PCN to the appropriate Federal or state offices (U.S. FWS, state natural resource or water quality agency, EPA, State Historic Preservation Officer (SHPO) or Tribal Historic Preservation Office (THPO), and, if appropriate, the NMFS).

77 Fed. Reg. at 10287. The Corps contends it is not necessary to coordinate with other agencies with regard to linear projects, because no linear project may proceed under NWP 12 if it results in the loss of greater than ½ acre of water. The Court agrees and concludes the Corps' interpretation is not arbitrary and capricious.

Plaintiffs contend NWP 12 violates § 404(e) of the Clean Water Act because NWP 12 improperly permits the Corps district staff to make determinations regarding the minimal effects on a project-by-project basis. As noted by the Corps, use of the general permit system obviates the need for public comment with regard to individual projects. Therefore, to the extent a project falls within the scope of NWP 12, the Corps has already concluded, based on standards set after notice and comment, that the effect will be minimal. The safeguard in the system is the ability of the Corps district staff to conclude that although an activity falls within the terms of NWP 12, its cumulative impact exceeds the minimum impact permitted by the CWA. The Corps also made the required minimal-impact determinations before reissuance of NWP 12.

Plaintiffs complain the Corps' issuance of NWP 12 violates the CWA, § 404(b)(1). Plaintiffs contend the NWP Decision Document does not include a precise description of the activities to be permitted under the General permit, explaining why they are sufficiently similar in nature and in environmental impact to warrant regulation under a single General permit. 40 C.F.R. § 230.7(b). Defendant cites the definition at 77 Fed. Reg. at 10263 noting that a "linear project" is "constructed for the purpose of getting people, goods, or services form a point of origin to a terminal point." "A 'utility line' is defined as any pipe or pipeline for the transportation of any gaseous, liquid, liquescent, or slurry substance, for any purpose, and any cable, line, or wire for the transmission for any purpose of electrical energy, telephone, and telegraph messages, and radio and television communication. The term 'utility line' does not include activities that drain a water of the United States, such as

8

drainage tile or french drains, but it does apply to pipes conveying drainage from another area." Decision Document, NWP 12, p. 1. The Decision Document sufficiently describes the activities to be permitted under NWP 12, notes what is not included, and as a result, Plaintiffs have not established Defendant Corps' promulgation of NWP 12 violated § 404(b)(1).

Plaintiffs also contend the reissuance of NWP 12 violated NEPA. Plaintiffs' argue the ½ acre threshold for loss of waters of the United States, the threshold for proceeding under NWP 12, is arbitrary and capricious. Plaintiffs contend there is no meaningful discussion about why the threshold is ½ acre versus some lesser acreage. The Corps decision document addressed a suggestion that NWP 12 "should also limit stream impacts to 300 linear feet." Fed Reg. 10184, at 10196. The Court finds it was not arbitrary and capricious for the Corps not to discuss lowering the threshold in the absence of any public comment regarding the issue. The public comment received in response to the notice of reissuance in 2011 contained questions and comments regarding the potential cumulative effect of the loss of ½ acres for each crossing, but did not challenge the ½ acre threshold that has been in effect since at least 1991.

Plaintiffs further contend the decision document fails to predict cumulative effects. Plaintiffs acknowledge the Corps' estimate that NWP 12 will be utilized approximately 39,500 times over a 5-year period, the duration of an NWP, with an impact of 2,000 acres. The Corps considered the impact of the conversion of forested wetlands, made provisions

therefore by providing for the potential for compensatory mitigation, and considered the historical and societal impact of NWP 12.

Plaintiffs further contend the Corps erred by failing to specifically discuss and analyze the risk of oil spills from the construction and use of NWP 12 verified utility lines. As noted by Defendant Corps, their role in the regulatory process is the determination of the impact of the discharge of fill or sediment into waters of the United States. The impact of spills from the pipeline is an issue for the Pipeline Hazardous Materials Safety Administration, which will govern use of the pipeline when the pipeline actually is used to move oil between Cushing and other locations, which the Corps noted in its assessment. Additionally, the Corps' decision document considers the ten most common causes of impairment of wetlands, and nothing therein indicates that the inadvertent discharge of oil was one of those causes.

Plaintiffs contend the Corps' process failed because it did not consider the impact of forested wetland conversion to scrub wetlands. The Court disagrees, noting that the Decision Document contemplates compensatory mitigation for such conversion. The Decision Document provides that mechanized clearing of a forested wetland cannot result in loss of waters, but is limited to conversion of wetland type. Decision Document, p. 6. Any loss from mechanized landclearing can be offset by compensatory mitigation.

Plaintiffs contend reissuance of NWP 12 violated NEPA because the Corps made a Finding of No Significant Impact ("FONSI") without sufficient support. In support of this argument Plaintiffs first cite to the single sentence, following pages of analysis, wherein the Corps made its actual FONSI. As noted by Defendants, the FONSI references the preceding

10

pages, which constitute the Environmental Assessment, and are incorporated by the FONSI, and thus the FONSI was not without factual support.

Plaintiffs further claim the Corps should have prepared an Environmental Impact Statement ("EIS").[2] As the parties are aware, an EIS is required when actions proposed by a federal agency could significantly affect the quality of the human environment. 42 U.S.C. § 4332(C). An agency such as the Corps may begin its assessment regarding the affect on the quality of the human environment with an Environmental Assessment ("EA"), a "concise public document . . . that serves to . . . [b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement . . . . " 40 C.F.R. § 1508.9(a)(1). A finding that NWP 12 would not significantly affect the quality of the human environment resulted in a FONSI, which Plaintiffs contend violated NEPA.

Pursuant to the APA, the Court reviews the Corps' decision not to issue an EIS under the deferential arbitrary and capricious standard outlined above. *See* 5 U.S.C. § 706(2)(A). To determine whether the agency acted arbitrarily and capriciously, "[the Court] will not substitute [its] judgment of the environmental impact for the judgment of the agency, but [it] will insist that the agency has, in fact, adequately studied the issue and taken a hard look at the environmental consequences of its decision." *Save Our Cumberland Mountains v.*

---

[2] Plaintiffs note that an EIS was prepared by the Department of State, with the cooperation of the Corps of Engineers, when the Keystone XL pipeline project was still viable. Plaintiffs point to this EIS, which is hundreds of pages in length, to support their theory that NWP 12 should have been supported by an EIS and that the issuance of verifications in this case was improper. Plaintiffs, however, do not cite to any particular page of this exhibit in support of their argument, making it difficult for the Court to assess the validity of Plaintiffs' contentions. Additionally the document was the result of a project of much broader scope, and thus it is unlikely that all conclusions therein can be applied to the verifications at issue herein.

*Kempthorne*, 453 F.3d 334, 339 (6th Cir.2006) (*citing Kelley v. Selin*, 42 F.3d 1501, 1518-19 (6th Cir.1995)) (internal quotation marks omitted).  The Court should keep in mind that "NEPA does not require agencies to adopt any particular internal decisionmaking structure." *Baltimore Gas & Elec. Co. v. Nat'l Res. Defense Council, Inc.*, 462 U.S. 87, 100, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983).  While there is no "universal formula for what an EA must contain and consider," *Friends of Congaree Swamp v. Fed. Highway Admin.*, 786 F.Supp.2d 1054, 1062 (D.S.C.2011), an EA must, at a minimum, include discussion of the need for the proposal, alternatives, the environmental impacts of the proposed action and the alternatives, and the agencies and persons consulted, 40 C.F.R. § 1508.9(b).

      The Court finds that the EA in this case met the minimum requirements, it discussed alternatives, the impact of the proposed action, and offered mitigation options to offset certain environmental impact.  Plaintiffs argue the controversial nature of pipelines warranted an EIS, however, as noted by the Corps, NWP 12 is not itself controversial, it is used for numerous non-controversial projects.  The fact of controversy over the original Keystone XL pipeline does not carry over to this action to mandate an EIS before a FONSI could be made.

      In short, having reviewed the decision document, the Court concludes that the Corps took the requisite "hard look" at the environmental consequences of its decision to issue NWP 12, the Corps did not act arbitrarily and capriciously in conducting its cumulative impact analysis and making a finding of no significant impacts, and was not required to complete a full EIS.  The Corp considered the potential impact on the environment based on anticipated NWP 12 permit usage during the five year period that this version will be in

effect. The Corps adopted mitigation efforts to offset temporary loss of waters of the United States and the conversion of wetlands for forested to scrub.

## AS APPLIED CHALLENGE[3]

Plaintiffs also challenge the verifications issued by the Corps in conjunction with the Cushing Keystone pipeline. As noted by Defendant Corps, the Court's "deference to the agency is greatest when reviewing technical matters within its area of expertise . . . ." *Colorado Wild, Heartwood v. U.S. Forest Service*, 435 F.3d 1204, 1216 (10th Cir. 2006)(quoting *Louisiana ex rel. Guste v. Verity*, 853 F.2d 322, 329 (5th Cir. 1988)). Plaintiffs contend the Corps erred in concluding the impact of the activity would be minimal, either individually or cumulatively.

In support of this argument Plaintiffs rely on the declaration of an expert, Thomas Hayes, Ph.D. Defendants challenge Plaintiffs' reliance on Mr. Hayes' affidavit in part because Mr. Hayes' methodology is not the same as used by the Corps, including such core issues as the factors used to define a wetland. The Preconstruction Notifications and Wetlands Delineations filed by Defendant Corps and submitted to it by TransCanada, indicate that for a number of crossings, individual assessments of whether the crossing implicated wetlands were undertaken. Corps' employees verified information from many of the crossing sites by making field visits to proposed fill waters. To avoid unnecessary

---

[3] To the extent Plaintiffs' as applied challenge mirrors issues raised in their facial challenge, for example the failure to seek interagency coordination under General Condition 31, the Court declines to address those issues on an as applied basis, having concluded they do not apply to NWP 12.

wetlands impact the Corps required compensatory mitigation. Contrary to Plaintiffs' contentions, the three district offices of the Corps consulted with one another to assess the cumulative impact of the entire project, not limiting the consideration to the segment assigned to a particular district. The Court accepts the Corps factual conclusions in support of the verifications issued to TransCanada and concludes that its decision to issue the verifications was not arbitrary and capricious.

As a result of the above, the Court finds that Plaintiffs have failed to establish they are entitled to injunctive relief under Rule 65(a). The Court would be remiss, however, if it did not address the equities in this case. The TransCanada intervenors have fulfilled every requirement of the United States Government to obtain verification of their preconstruction notifications to construct the 485-mile pipeline. Thus far they have spent in excess of $500,000,000. It is undisputed that further delay will cost hundreds of thousands of dollars each day. Plaintiffs have not suggested they have the ability to post a bond to cover any of the irretrievable loss should they ultimately lose.[4]

On the other side of the coin, the procedures followed by the Corps and TransCanada have been in pertinent part unchanged for over twenty years. During that period the law mandated that the NWPs be reissued every five years, with opportunity for input and objection from the public. At least one Plaintiff, the Sierra Club, has been active over the

---

[4] The Court acknowledges it has discretion in any bond requirement. *See Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir.1987).

years in making public comments and it has not been drawn to the Court's attention that it specifically objected to many of the processes it now calls an abuse of discretion.[5]

In essence this is all over a loss of waters of the United States of less than one acre, as determined by the Corps, over the entire distance of the pipeline. While this does not bear on whether the Corps complied with the Clean Water Act, the National Environmental Policy or the Administrative Procedures Act, it is relevant.

The Court should also note that it was forced to make this decision with little time for review of the exhibits totaling thousands of pages. This case involves a very complex body of law. It is a veritable spider web of statutes and regulations. The Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction was filed on July 13, 2012. The response from the federal defendants thereto was not received until August 2, 2012. The Court reviewed the volumes of briefs and papers prior to conducting a hearing on August 3, 2012. As noted, the project is set to begin on August 6, 2012. The Court is issuing this truncated opinion on August 5, 2012.

The Court is sympathetic with the Plaintiffs' efforts to protect our environment. We all have a vested interest in that. However, while acknowledging the limited time it had to to consider this complex case, the Court is satisfied that Plaintiffs have failed to show that

---

[5] For example, in objecting to the most recent reissuance of the NWPs, the Sierra Club joined an objection that notes that "[a]t least 28 NWPs allow unlimited impacts to wetlands and streams: 1, 2, 3, 4, 7, 9, 10, 11, 15, 16, 17, 20, 22, 23, 24, 25, 27, 28, 30, 31, 33, 35, 37, 38, 41, 45, 48, 49." Federal Defendant's Ex. 2, p. 11. NWP 12 is notably absent from this list, but is one of Plaintiffs' main objections in the current case.

this project will have more than a minimal impact on the environment.  Its benefits, as set forth in the briefs of the federal Defendants and TransCanada, far exceed its costs.

Having concluded that Plaintiffs failed to establish a substantial likelihood of success on the merits, the application for temporary restraining order and preliminary injunction is DENIED.

IT IS SO ORDERED this 5th day of August, 2012.

_/s/ David L. Russell_
DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE