**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| SIERRA CLUB, INC., CLEAN ENERGY<br>FUTURE OKLAHOMA, and EAST TEXAS<br>SUB REGIONAL PLANNING COMMISSION,<br><br>      Plaintiffs,<br><br>v.<br><br><br>LIEUTENANT GENERAL THOMAS P.<br>BOSTICK (in his official capacity  as<br>Commanding General and Chief of<br>Engineers of the U.S. Army Corps of Engineers,<br> MAJOR GENERAL MICHAEL J. WALSH,<br>in his official capacity as U.S. Army Commanding<br>General for Civil and Emergency Operations;<br>COLONEL RICHARD PRATT[1], in his official<br> capacity as Tulsa District Commander of U.S.<br>Army Corps of Engineers; Colonel Richard<br>Pannell, in his official capacity as Galveston<br>District Engineer of the U.S. Army Corps of<br>Engineers; U.S. ARMY CORPS OF ENGINEERS,<br><br>      Defendants,<br><br>TRANSCANADA KEYSTONE PIPELINE, LP,<br>a Delaware limited partnership, and<br>TRANSCANADA CORPORATION, a Canadian<br>public company, et al.,<br><br>      Intervenors. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) CASE NO CIV-12-742-R<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**<u>ORDER</u>**

On June 29, 2012, Plaintiffs filed this action to challenge the March 19, 2012

---

[1] Pursuant to Fed.R.Civ.P. 25(d), Colonel Pratt is substituted for Colonel Teague and Colonel Parnell is substituted for Colonel Sallese.

reissuance of Nationwide Permit (NWP) 12 by the United States Army Corps of Engineers ("Corps") and the 2012 decisions by three regional offices of the Corps to issue verifications to Intervenor TransCanada Corporation indicating that certain projects for which pre-construction notification (PCN) was given could be pursued within the scope of NWP 12. Plaintiffs sought declaratory and injunctive relief in an effort to prevent TransCanada from initiating construction on a pipeline to run between Cushing, Oklahoma and Nederland, Texas.  Plaintiffs' challenges are lodged pursuant to the Administrative Procedures Act ("APA"), the National Environmental Policy Act ("NEPA") and the Clean Water Act ("CWA").  On August 5, 2012, the Court entered an order denying Plaintiffs' request for preliminary injunctive relief.  Plaintiffs thereafter appealed the denial to the United States Court of Appeals for the Tenth Circuit, which affirmed this Court's denial of preliminary injunctive relief.  *Sierra Club, Inc. v. Bostick*, --- Fed.Appx. ---, 2013 WL 5539633 (10th Cir. Oct. 9, 2013).  In the interim, Plaintiffs filed a motion for summary judgment to which Defendants and Intervenors have responded.  Having considered the parties' submissions, the Court finds as follows.[2]

The origin of this dispute was TransCanada's desire to construct a pipeline between Hardisty, Alberta, Canada and Nederland, Texas.  To that end, TransCanada sought permission from the U.S. Department of State to construct a cross-border pipeline, required because the pipeline would cross from Canada into the United States.  Upon advice of the

---

[2] Additional motions filed by the parties will be addressed herein as necessary to resolution of the instant motion.

Department of State, President Obama denied the request in January 2012. Thereafter TransCanada divided its original intercontinental pipeline into segments, to include the current portion at issue herein, known as the Gulf Coast Pipeline.

In support of its efforts to construct the Gulf Coast Pipeline, TransCanada submitted PCN to three district offices of the Army Corps of Engineers through which the pipeline runs. TransCanada sought verification from the Tulsa, Fort Worth and Galveston District Offices that the project fell within the scope of NWP 12. The Galveston district issued its verification on June 25, 2012, followed by the Tulsa District on June 28, 2012,[3] and finally, the Fort Worth District on July 16, 2012. Each District confirmed that the portion of the project within its jurisdiction could proceed under NWP 12, and informed TransCanada that the verification was valid until "the NWP is modified, reissued, or revoked." SWF 010594, SWG 0000001-00483, SWT 0004277. In response to the verifications, Plaintiffs filed the instant action asserting facial challenges to the reissuance of NWP 12, and challenging the verifications issued by the Corps' district offices.

This case centers around a permitting system established under the Clean Water Act, which operates to restore and maintain the "chemical, physical and biological integrity" of the nation's waters, in part by prohibiting dredging or filling of waters of the United States without a permit from the Corps. 33 U.S.C. §§ 1251, 1344; 40 C.F.R. § 230.1(a); *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1269 (10th Cir. 2004).

---

[3] The Tulsa District issued a revised verification on August 1, 2012.

There are two types of section 404 permits: individual permits that authorize specific activities on a case-by-case basis, [33 U.S.C. § 1344(a)], and general permits that provide standing authorization for all activities that fit the description in the permit, *id.* § 1344(e). Individual permits are subject to the requirements of the National Environmental Policy Act ("NEPA"). 33 C.F.R. § 325.2(a)(4). A general nationwide permit, on the other hand, must undergo that extensive process at the time the permit is promulgated, rather than at the time an applicant seeks to discharge fill material under such a permit. *Id.* § 330.5(b)(3). Project proponents may usually "proceed with activities authorized by NWPs without notifying the [Corps]." *Id.* § 330.1(e)(1). The Corps does, however, allow permittees to request verification from the Corps that an activity complies with the terms and conditions of a nationwide permit, and in some cases permittees are required do so prior to beginning work under the permit. *Id.* § 330.6(a)(1).

*Snoqualmie Valley Pres. Alliance v. U.S. Army Corps of Engineers*, 683 F.3d 1155, 1158 (9th Cir. 2012).[4]

In carrying out his functions relating to the discharge of dredged or fill material under this section, the Secretary may, after notice and opportunity for public hearing, issue general permits on a State, regional, or nationwide basis for any category of activities involving discharges of dredged or fill material if the Secretary determines that the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment. Any general permit issued under this subsection shall (A) be based on the guidelines described in subsection (b)(1) of this section, and (B) set forth the requirements and standards which shall apply to any activity authorized by such general permit.

33 U.S.C. § 1344(e)(1); *see also* 33 C.F.R. § 330.1 (establishing policies and procedures for the issuance of nationwide permits).

"Once a general permit has been issued, individual activities falling within the

---

[4] The regulations governing the nationwide permit program provide that the Corps must "review all incoming applications for individual permits for possible eligibility under regional general permits or NWPs." 33 C.F.R. § 330.1(f).

categories of activities in the general permit may be authorized (or "verified") under that

permit, again so long as their adverse environmental impacts do not exceed minimal levels

and so long as they meet the additional restrictions contained in the permit." *Maryland*

*Native Plant Soc'y v. U.S. Army Corps of Engineers*, 332 F.Supp.2d 845, 848 (D.Md.

2004)(citing 33 U.S.C. § 1344(e)).  If not, or if a project does not qualify for verification, "the

Corps must evaluate it under the individual permit process under § 404(a), the corresponding

regulations of which impose a host of additional requirements on the agency." *Id.* (citing 33

C.F.R. § 325.2)(footnote omitted).  An application for individual permit is subject to public

notice and comment before the Corps determines whether to issue the permit.  33 U.S.C. §

1344(a); 33 C.F.R. §§ 325.2(a)(2), 325.3(a).

Plaintiffs' first challenge the reissuance of NWP 12 under NEPA.  "NEPA applies to

activities authorized by the Corps under the CWA." *Maryland Native Plant Soc'y*, 332

F.Supp.2d at 849.  NEPA is a procedural rather than  substantive law., mandating that federal

agencies follow certain procedure, but not dictating results. *See Winter v. Natural Res. Def.*

*Council, Inc.*, 555 U.S. 7, 23 (2008)(NEPA imposes only procedural requirements to ensure

that the agency will have available and  carefully consider detailed information concerning

significant environmental impacts).  NEPA requires agencies to consider the environmental

consequences of their actions, while mandating public participation in the decision-making

process.  Agencies must take a "hard look" at the environmental consequences of "major

Federal actions significantly affecting the quality of the human environment."  42 U.S.C. §

4332.  Before commencing activities covered by NEPA, an agency must prepare a"detailed

statement," an Environmental Impact Statement ("EIS"), which analyzes the potential environmental impact of a proposed action.  42 U.S.C. § 4332(2)(C); 40 C.F.R.  § 1502.1. If, however, the significance of environmental impacts is unclear, an agency may alternatively prepare an Environmental Assessment ("EA"), "a concise public document . . . that serves to briefly provide sufficient evidence and analysis for determining whether to prepare an EIS or a finding of no significant impact (FONSI)."  40 C.F.R. § 1508.9(a).  If after conducting an EA ,the agency finds that no EIS is needed, the agency issues a FONSI, which "means that the agency has determined its action will not have a significant effect on the human environment."  *Defenders of Wildlife v. Ballard*, 73 F.Supp.2d 1094, 1101-02 (D.Ariz. 1999).

In the instant case, in the course of reissuing NWP 12 in 2012, the Corps issued a FONSI, after completing an EA and determining that the activities authorized by NWP 12 would only have minimal cumulative environmental impacts. "[I]ssuance of this NWP will not have significant impact on the quality of the human environment.  Therefore, the preparation of an Environmental Impact Statement is not required."  Decision Document at p. 46.[5]  Plaintiffs contend that the Corps' reissuance of NWP 12 violated both NEPA and the CWA, and thus it is necessary to consider what NWP 12 authorizes.

NWP 12 allows for "[a]ctivities required for the construction, maintenance, repair, and

---

[5] "An agency's decision to issue a FONSI and not prepare an EIS is a factual determination which implicates agency expertise." *Greater Yellowstone Coalition*, 359 F.3d 1257, 1274 (10th Cir. 2004).  The Court determines "whether the agency acted arbitrarily and capriciously in concluding that the proposed action will not have a significant effect on the human environment." *Id.* (quoting *Davis v. Mineta*, 302 F.3d 1104, 1112 (10th Cir. 2002)).

removal of utility lines and associated facilities in waters of the United States, provided the activity does not result in the loss of greater than 1/2-acre of waters of the United States for each single and complete project**."** 77 Fed. Reg. 10271.  The definition of "utility line" includes, "any pipe or pipeline for the transportation of any gaseous, liquid, liquescent, or slurry substance, for any purpose." *Id.*  Loss of waters of the United States is defined as

> Waters of the United States that are permanently adversely affected by filling, flooding, excavation, or drainage because of the regulated activity.  Permanent adverse effects include permanent discharges of dredged or fill material that change an aquatic area to dry land, increase the bottom elevation of a waterbody, or change the use of a waterbody. . . Waters of the United States temporarily filled, flooded, excavated, or drained, but restored to pre-construction contours and elevations after construction, are not included in the measurement of loss of waters of the United States.

77 Fed. Reg. 10289.

Pre-construction notification to the district engineer is required for projects slated to proceed under NWP 12 if, one or more of the following criteria is met:

> (1) The activity involves mechanized land clearing in a forested wetland for the utility line right-of-way; (2) a section 10 permit is required; (3) the utility line in waters of the United States, excluding overhead lines, exceeds 500 feet; (4) the utility line is placed within a jurisdictional area (i.e., water of the United States), and it runs parallel to or along a stream bed that is within that jurisdictional area; (5) discharges that result in the loss of greater than 1/10-acre of waters of the United States; (6) permanent access roads are constructed above grade in waters of the United States for a distance of more than 500 feet; or (7) permanent access roads are constructed in waters of the United States with impervious materials. (See general condition 31.) (Sections 10 and 404)

77 Fed. Reg. 10272.  Additionally, "[i]n response to a pre-construction notification or a request to verify that an activity is authorized by NWP, a district engineer may add activity-

specific conditions to the NWP authorization or suspend or revoke the NWP authorization if he or she determines that the proposed activity would result in more than minimal adverse effects." 77 Fed. Reg. 10185-86; 33 C.F.R. § 330.5(c)(1).

Finally, Plaintiffs' contentions that Defendants failed to fulfill the Corps' obligations must be considered under the proper standards of review in an administrative challenge and in the context of Plaintiffs' motion for summary judgment. While generally, summary judgment is appropriate when the pleadings and the record demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law,[]" Fed.R.Civ.P. 56(c), Plaintiffs' claims herein involve the Corps' issuance of a NWP, which is a final agency action subject to judicial review under the APA. 5 U.S.C. § 702; *Ohio Valley Envtl. Coal. et al. v. Aracoma Coal Co. et al.* ("*Aracoma Coal*"), 556 F.3d 177, 192 (4th Cir.2009) ("Claims challenging federal agency action under CWA and NEPA are subject to judicial review under the APA."). The Court does not resolve factual questions, instead determining "whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Sierra Club v. Mainella*, 459 F.Supp.2d 76, 90 (D.D.C.2006) (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir.1985)). Summary judgment becomes the "mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Id.*

Under the APA, the Court will set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §

706(2)(A).  The Court considers "whether the agency considered the relevant factors and whether a clear error of judgment was made." *Aracoma Coal*, 556 F.3d at 192.  The court must ensure that an agency has "examine[d] the relevant data (impacts) and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' " *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)).

The Court's scope of review is narrow and the Court may not to substitute its judgment for that of the agency.  *Id.* at 43, 103 S.Ct. 2856.  "Review under this standard is highly deferential, with a presumption in favor of finding the agency action valid." *Aracoma Coal*, 556 F.3d at 192.  As a result, the Court may not set aside the Corps' decisions 'simply because the court is unhappy with the result reached.'" *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1284 (1st Cir.1996) (quoting *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983)).

With regard to certain of Plaintiffs' challenges, the Court will be called upon to consider the Corps' interpretation of certain statutes.  "If the statue is silent or ambiguous about the question at issue . . . [the court defers] to the authorized agency and [applies] the agency's construction so long as it is a reasonable interpretation of the statute." *Arizona Public Serv. Co. v. U.S. EPA*, 562 F.3d 1116, 11232 (10th Cir. 2009).  Further, "[a]n agency is entitled to *substantial* deference when it acts pursuant to an interpretation of its own regulation. The agency's interpretation is controlling unless plainly erroneous or inconsistent

with the regulation." *Id.* (quotations and citations omitted).

Lastly, under the APA the Court must generally confine its review to the explanations offered by the agency in the administrative record and to items in the administrative record. *See Richards v. Immigration & Naturalization Serv.*, 554 F.2d 1173, 1177 (D.C.Cir. 1977). In this case, however, the Court permitted Plaintiffs to supplement the administrative record with materials they contend the Defendant Corps should have considered in re-issuance of NWP 12. *See Lee v. U.S. Air Force*, 354 F.3d 1229, 1242 (10th Cir. 2004)(permitting consideration of extra-record materials in limited circumstances).

Because Plaintiffs raise a facial challenge to NWP 12, Defendants advocate for application of the "no set of circumstances" test, which would uphold NWP 12 unless Plaintiffs could establish that the NWP would be invalid under all circumstances. *See Colorado Wild Heartwood v. U.S. Forest Serv.*, 435 F.3d 1204, 1214 (10th Cir.2006)(applying *United States v. Salerno*, 481 U.S. 739, 745 (1987)*,* "no set of circumstances" review to a facial challenge to a Forest Service categorical exclusion). As stated by the court in *Sierra Club v. Bosworth*, 510 F.3d 1016 (9th Cir. 2007), "even if we were to apply [the no set of circumstances test] in this case, it would not benefit the Forest Service. If the Forest Service failed to comply with the procedures required under NEPA in promulgating the Fuels CE [categorical exclusion], then its procedural noncompliance would render the Fuels CE unlawful regardless of how the CE is applied. The invalidity of the CE flows from the NEPA violation, not from the application of the CE." *Id.* at 1022. Similarly, in *Wildlaw v. U.S. Forest Serv.*, 471 F.Supp.2d 1221 (M.D.Ala. 2007), the court concluded

that "plaintiffs who mount a facial challenge to a CE on grounds that it is unsupported by the record need not demonstrate that all actions falling into the CE significantly affect the human environment." *Id.* at 1234. "[N]o set of circumstances exists under which a regulation adopted using procedures noncompliant with NEPA or the Administrative Procedure Act would be valid." *Id.* at 1234, n. 11. Accordingly, although the "no set of circumstances" rule may technically apply, with regard to certain of Plaintiffs' arguments, either the Corps complied with NEPA or it did not, and failure to comply will be sufficient to invalidate NWP 12.

With these standards in mind, the Court turns to parties' specific arguments under NEPA and the CWA, starting with certain affirmative defense raised by Defendants and the Intervenors.

### Statute of Limitations

Defendants and Intervenors argue that certain of Plaintiffs' challenges to NWP 12 are barred by the six-year statute of limitations. *See* 28 U.S.C. § 2401. These arguments are premised on the fact that prior renditions of NWP 12 contained the same terms or definitions as the current version. As a result, Defendants and Intervenors argue that despite reissuance of NWP 12 in March 2012, the failure to challenge the provisions in an earlier rendition forecloses any challenge at this time.[6] Defendants characterize Plaintiffs challenge to certain definitions, i.e. " single and complete project" and "loss of waters" as challenges that are

---

[6] General permits under the CWA cannot be issued for a period of greater than five years. 33 U.S.C. § 1344e(2).

barred because those definitions were added in 1991.  The Court disagrees.

The reissuance of a nationwide permit constitutes final agency action after full interagency and public interest review.  Once a particular NWP has expired, suits challenging the expired NWP become moot unless projects authorized under the prior NWP are grandfathered for some period thereafter.  *See Kentuckians for Commonwealth, Inc. v. Rivenbargh*, 269 F.Supp.2d 710 (S.D.W.Va. 2003)(concluding that challenge to 1996 NWP moot because five-year permit and one year extension had expired).  Conversely, it would seem anomalous to bar judicial review to portions of a reissued NWP that were part of a prior version thereof, when by law, the NWPs must be reissued at least every five years, and changes may be made to a NWP that impact application of the entire NWP, including provisions added by versions in effect more than six years prior.  As such, and in the absence of any authority directly on point, the Court finds that Defendants are not entitled to rely on the statute of limitations defense to Plaintiffs' facial challenge to NWP 12.[7]

---

[7]The defense of waiver as raised by Defendants and Intervenors will be addressed where relevant.

**Failure to Analyze Risk of Spills**

Plaintiffs first contend that the Decision Document[8] for NWP 12 is deficient because it fails to assess the risks associated with oil spills, the potential for spills, the impact of different types of oil on the severity of a spill, and the potential frequency of such spills, which Plaintiffs argue requires the Court to conclude that the Corps did not meet NEPA's dictate that it take a "hard look" at the environmental consequences of its actions.   In response, the Corps first notes that in reissuing NWP 12, the Corps did not approve the Gulf Coast Pipeline, but rather authorized the discharge of dredge or fill material into waters of the United States with regard to the constructions of utility lines under certain conditions. The Corps further notes that the EA considered many potential direct, indirect, and cumulative effects of reissuing NWP 12, and that it relied on data provided by the Environmental Protection Agency ("EPA") in assessing the top environmental concerns within the Corps' limited purview, and the spilling of oil was not included in the top causes. TransCanada similarly argues that the scope of the Corps' analysis of the impact of reissuance of NWP 12 is as it pertains to the discharge of dredge or fill material, not particularly with regard to pipeline approval.  Finally, Defendants and Intervenors argue that Plaintiffs waived this  argument by failing to present the issue during the public comment period preceding reissuance of NWP 12.

"Parties must alert an agency to their position and contentions. . . .  A party waives

---

[8] The Decision Document "discusses the factors considered by the Corps of Engineers (Corps) during the issuance process for this Nationwide Permit (NWP))."  Decision Document NWP 12 , p. 1 (hereinafter "Decision Document".  It includes the EA.

arguments that are not raised during the administrative process." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1081 (9th Cir. 2011)(citations omitted).  Accordingly, persons challenging an agency's compliance with NEPA must "structure their participation so that it ... alerts the agency to the [parties'] position and contentions," in order to allow the agency to give the issue meaningful consideration.  *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 553, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). Defendants and Intervenors contend Plaintiffs failed to inform the Corps of their contention that  oil spills should have been addressed in the Decision Document.  Although Plaintiffs submitted comments addressing a variety of issues in response to the proposal to reissue the NWPs, Plaintiffs did not challenge the Corps' failure to address the potential for and impact of any oil spills that might occur.

The Court agrees with the Corps' waiver argument, to a degree.  The Court finds that the identity of the person or entity that raised a particular issue during the administrative process is not controlling  Rather, if an issue was brought to the attention of the Corps during the public comment period, that issue may be challenged in judicial proceedings, by the original objector or any another person.  *See Choate v. U.S. Army Corps of Engineers*, 2008 WL 4833113 (E.D.Ark, Nov. 5, 2008)(Supreme Court did not limit who could bring actions under NEPA based on participation in the administrative process; rather, it limited what could be raised in those actions); *Wyoming Lodging and Rest. Ass'n. v. U.S. Dept. of Interior*, 398 F.Supp.2d 1197, 1210 (D.Wyo. 2005) ("[S]o long as the agency is informed of a particular position and has a chance to address that particular position, any party may

challenge the action based upon such position whether or not they actually submitted a comment asserting that position."). As noted in *New Mexico Environmental Imp. Div. v. Thomas*, 789 F.2d 825, 835 (10th Cir. 1986), the policy behind refusing to consider issues not presented to the agency is that the Court does not substitute its judgment for that of the agency. If the agency is presented an opportunity to consider an issue, regardless of the proponent during administrative proceedings, the agency will have had the requisite opportunity, regardless of who voiced the issue. Accordingly, to find waiver of an issue, the Court must first determine whether that issue was presented to the Corps during the public comment period.

Review of the record reveals that no person or entity raised the absence of discussion of oil spills as a shortcoming with regard to the Corps' NEPA analysis in reissuance of the NWP. Hoping to avoid waiver, Plaintiffs contend that the risk of spills was obvious and known to the Corps, in part because of the EIS prepared for the abandoned Keystone XL Pipeline, and therefore the Corps should have *sua sponte* addressed the issue while fulfilling its obligation of complying with NEPA. Plaintiffs rely in part on *'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083 (9th Cir. 2006). Therein, the Army internally acknowledged shortcomings with its preliminary EIS as to why particular sites had been selected for a project. The court concluded that despite the fact that the plaintiff had not participated in the public comment period, the claims were not waived because the record was replete with evidence that the Army had recognized the specific shortfall and not addressed it. *Id.* at 1092-93. This Court finds that the fact that the Corps was a participating agency with regard

15

to the Keystone XL EIS, which was specifically a pipeline project seeking individual permitting, did not render the Corps responsible for raising the issue during the process of reissuing NWP 12, largely because NWP 12 is not project specific.

Furthermore, as noted by the Corps, the evidence upon which it relied in reissuing NWP 12 identified the top ten causes of water spoilation as identified by the EPA, and oil spills were not on that list. Although Plaintiffs contend that the flaws in the EA with regard to the absence of discussion regarding oil spills were so obvious the public need not point them out, the Court finds that as a result of the EPA data, that the issue was not so obvious, especially in light of the focus of NWP 12, the dredging and filling in water for purposes of various types of utility lines, not merely pipelines, and certainly not only the Gulfcoast Pipeline. Further, if the issue was obvious, Plaintiffs likely would have included it in the issues they raised before the Corps during the administrative process. Accordingly, the Court finds that the right to challenge the absence of discussion of oil spills from the Decision Document in support of NWP 12 has been waived.

### Failure to Analyze Cumulative Impact of Pipelines

Plaintiffs argue the Corps violated NEPA by failing to analyze the cumulative impact of pipelines authorized by NWP 12. Defendants contend the EA prepared concurrently with the issuance of NWP 12 considered many potential direct, indirect and cumulative effects. Defendants note that the EA discusses the no action alternative, the impact of reissuing NWP 12, and the impact on the affected environment, which the Corps addressed via review of national databases indicating types of waters. NWP3114-18. Defendants further contend

16

that the Corps' predictive analysis sufficiently considered the impact of discharges authorized by NWP 12.  NWP 3138-3141.[9]

Again, this issue was not raised by Plaintiffs or any other party during the administrative process, and therefore, the Court concludes judicial challenge thereto was waived.[10]  Plaintiffs attempt to force the Corps to anticipate every potential issue during the process designed for the public to raise issues so as to allow the Corps to remedy any shortcomings in its process.  The process, however, does not permit a party to ambush an agency by making new demands during litigation.

Furthermore, the Court finds that Plaintiffs' claim lacks merit.  NEPA regulations provides that an EA "[s]hall include brief discussions of the  . . . environmental impacts of the proposed action and alternatives."  40 C.F.R. § 1508.9(b).  This must include discussion

---

[9]     The individual and cumulative adverse effects on the aquatic environment resulting from the activities authorized by this NWP will be minimal.  The Corps expects that the convenience and time savings associated with the use of this NWP will encourage applicants to design their projects within the scope of the NWP, including its limits, rather than request individual permits for projects that could result in greater adverse impacts to the aquatic environment.  Division and district engineers will restrict or prohibit this NWP on a regional or case-specific basis if they determine that these activities will result in more than minimal individual and cumulative adverse effects on the aquatic environment.

Decision Document, p. 39-40.

[10] Plaintiffs cite to two pages of the record which they contend challenged the Corps' cumulative impacts analysis, or alleged lack thereof.  NWP-23691, the first page of comments to the Corps, merely states, without reference to NWP 12, that "the Corps' proposal routinely flouts its legal obligation to limit general permits to activities that will not cause more than minimal adverse impact individually and cumulatively. The majority of the permits allow unlimited impacts to wetlands and streams, while numerous others allow waivers of impact limitations at the discretion of the District Engineer."  NWP023248, is an April 18, 2011 letter to the Corps objecting to certain NWPs, which states in its introductory paragraph that "[t]he focus of our comments is on proposed NWPs 21, 49 and 50, which all apply to coal mining activities."  Nothing on that page directs the Corps' attention to alleged inadequacies in NWP 12.

of the cumulative impact, "the impact on the environment which results from the incremental impact of the [proposed] action when added to other past, present, and reasonably foreseeable future actions." *Id.*, 40 C.F.R. § 1508.7. Plaintiffs argue that "the Corps' cumulative effects analysis provides a general overview of activities that have contributed to impairment of water resources nationwide, and historical rates of wetland losses in the U.S. over the last 200 years. This 'cumulative effects analysis' is the same boilerplate language that the Corps uses as a cumulative effects analysis in each of the 52 NWP Decision Documents, regardless of the permitted activity. Thus, while the Corps may claim otherwise, there is no analysis of the cumulative impacts of oil pipelines permitted by NWP 12." Motion for Summary Judgment at p. 18.

The Court again notes that Plaintiffs' arguments appear designed to cast NWP 12 as solely applying to oil pipelines. NWP 12, however, addresses utility lines generally, it is not limited to pipelines that carry oil. Accordingly, the Corps was required to consider the cumulative impact of discharging dredged or fill material authorized, not the impact of the differing types of pipelines and utility lines authorized by NWP 12. Additionally, the Corps reasonably chose to study the impacts to waters of the United States identified by the EPA, which again, did not include oil spills.[11] The Court also notes that although there is substantial repetition among the Decision Documents of the various NWPs, that there is indeed individualization.

---

[11] As noted by Intervenors, "[w]ater crossings along a linear project are naturally separate, and minor fill activity in one stream does not necessarily accumulate with minor fills at distant locations or in other streams." Utility Intervenor's Response to Motion for Summary Judgment, p. 29, note 62.

Based on reported use of this NWP during the period August 1, 2009, to July 31, 2010, the Corps estimates that this NWP will be used approximately 7,900 times per year on a national basis, resulting in impacts to approximately 400 acres of waters of the United States, including jurisdictional wetlands.  The Corps estimates that approximately 480 acres of compensatory mitigation will be required to offset these impacts. . . Using the current trend, approximately 39,500 activities could be authorized over a five year period until this NWP expires resulting in impacts to approximately 2,000 acres of waters of the United States, including jurisdictional wetlands.

Decision Document, p. 37.  The Court concludes that the Corps cumulative impacts analysis with regard to the reissuance of NWP 12 was not arbitrary and capricious.

## Uplands Sections

In conjunction with the above, Plaintiffs argue that the Corps has control and responsibility over pipelines and therefore 33 C.F.R. § 325 App. B(7)(b)(3) mandates that it also consider the cumulative impact of pipelines on any non-federal "uplands" sections. Again, the Court concludes that Plaintiffs waived this argument, as there is no indication in the record that Plaintiffs or any other person or entity presented the issue to the Corps during the administrative process.  Furthermore, even considering Plaintiffs' argument, the Court finds that the Corps' consideration was not arbitrary and capricious.

33 C.F.R. § Pt. 325 App. B provides the "implementing procedures for the Corps regulatory program" 33 C.F.R. Pt. 325, App. B § 2.  Section 7(b) thereof provides that "[i]n some situations, a *permit applicant* may propose to conduct a specific activity requiring a Department of the Army (DA) permit (e.g. construction of a pier in a navigable water of the United States), which is merely one component of a larger project (e.g., construction of an oil refinery on an upland area).  The district engineer should establish the scope of NEPA

document (e.g., the EA or EIS) to address the impacts of the specific activity requiring a DA permit and those portions of the entire project over which the district engineer has sufficient control and responsibility to warrant federal review." *Id.* (emphasis added). In support of this proposition Plaintiffs cite to cases involving individual CWA permits issued by the Corps, which are not helpful in the context of assessing an NWP, because NWPs are not directed to particular projects, but rather assess on a nationwide basis the impact of a category of activity, and further, TransCanada was not a permit applicant. *See* Decision Document, p. 21 ("The issuance of an NWP is based on a general assessment of the effects on public interest and environmental factors that are likely to occur as a result of using this NWP to authorize activities in waters of the United States. As such, this assessment must be speculative or predictive in general terms. Since NWPs authorize activities across the nation, projects eligible for NWP authorization may be constructed in a wide variety of environmental settings."). The impact on non-federal uplands cannot be assessed without specific knowledge of a particular project and the scope thereof.[12]

Additionally, even in cases involving individual § 404 permits, at least one court has concluded that consideration of impacts to upland areas is not required. "The specific activity that the Corps is permitting when it issues a § 404 permit is nothing more than the filling of jurisdictional waters. " *Aracoma Coal*, 556 F.3d at 194. The court continued by

---

[12]Although Plaintiffs complain that no agency ever prepared an EIS as indicated in the Decision Document, the Decision Document does not promise the completion of an EIS, but rather notes that one may be prepared for a particular utility line. Decision Document, p. 10 ("even though an environmental impact statement *may* be provided for a particular utility line")(emphasis added). However, where, as here, the Corps determines in verifying a PCN that the proposed project fits within the parameters of NWP 12 and that it will have minimal impact as required by NWP 12, no EIS or even an EA is required.

noting that Corps did not have sufficient control over the entire valley fill project, and it had reasonably identified the proper scope of review. *Id.* This is even more true, where, as here, there is no method to assess the impact on projects that might proceed across the country on unidentified lands. *See also Ohio Valley Envtl. Coal. ("OVEC") v. Hurst*, 604 F.Supp.2d 860 (S.D.W.Va. 2009)(applying *Aracoma* to nationwide permit).

This Court concludes the Corps was not arbitrary and capricious in reissuing NWP 12 in failing to consider the impact on uplands sections.

## Connected Actions

In a related issue, Plaintiffs complain that the EA issued in support of NWP 12 failed to consider the impacts from "connected actions."  Citing 40 C.F.R. § 1508.25, Plaintiffs contend the Corps should have assessed "interdependent parts of a larger action [which] depend on the larger action for their justification."  40 C.F.R. § 1508.25(a)(1)(iii).[13] Plaintiffs contend NWP 12 permits the piecemealing of pipelines of any length or impact by virtue of its definition of single and complete linear project.  The Utility Intervenors argue that Plaintiffs waived this issue by failing to raise the issue in response to the proposed NWP 12 issued by the Corps.  Response to Motion for Summary Judgment, Plaintiff 15-16.  The Court finds no evidence in the record that any other person or entity raised the issue during the administrative process and concurs with the intervenors that this issue was not raised by

---

[13] The Council on Environmental Quality issued regulations used to determine when actions are considered connected, meaning they are closely related and should be discussed in the same impact statement. *Hudson River Sloop Clearwater, Inc. v. Dep't of Navy*, 836 F.2d 760, 763 (2d Cir.1988) (per curiam) (quoting 40 C.F.R. § 1508.25(a)(1)).  Connected actions automatically trigger other actions, that cannot or will not proceed unless other actions have been taken previously or simultaneously, or that are interdependent parts of a larger action and depend on that larger action for their justification.  40 C.F.R. § 1508.25(a).

any comments in response to the Corps' notice that it intended to reissue NWP 12. As such, as set forth above, the Court finds that the issue has been waived, and is not subject to judicial review.

Furthermore, the Court finds that the Corps' failure to assess connnected actions was not arbitrary and capricious. Section 1508.25 addresses "scope" which "consists of the range of actions, alternatives, and impacts to be considered in an environmental impact statement." 40 C.F.R. § 1508.25.

> To determine the scope of environmental impact statements, agencies shall consider 3 types of actions, 3 types of alternatives, and 3 types of impacts. They include . . . [c]onnected actions, which means that they are closely related and therefore should be discussed in the same impact statement.

40 C.F.R. § 1508.25. First, "[b]y its plain language, . . . this regulation applies only to environmental impact statements." *Center for Biological Diversity v. Salazar*, 706 F.3d 1085, 1097-98 (9th Cir. 2013). This case is similar to *Center for Biological Diversity*, which addressed categorical exclusions under NEPA, which, like the NWP at issue herein, do not require separate project-based NEPA analysis. *Id.* at 1097. Furthermore, as noted by the court in *Wetlands Action Network v. U.S. Army Corps of Engineers*, 222 F.3d 1105 (9th Cir. 2000), *abrogated on other grounds by*, *Wilderness Soc. v. U.S. Forest Serv.*, 630 F.3d 1173(9th Cir. 2011), NEPA does not require the government to do the impractical, which is exactly the burden Plaintiffs seek to impose, by demanding that it anticipate what actions might be connected to projects that may proceed under NWP 12. *Id.* at 1119. The Court concludes that it was not arbitrary and capricious for the Corps not to consider connected

actions in reissuance of NWP 12.

## Lack of Analysis of Forested Wetland Conversions

Plaintiffs argue that the Decision Document fails to assess the cumulative impacts associated with unlimited conversion of high-quality forested wetlands to scrub-shrub wetlands.  Plaintiff contends the Corps recognized that there would be permanent losses of wetlands functions as a result of conversion to scrub wetlands.  Defendants contend the Corps reasonably determined that the conversion of wetland type was not a loss of waters of the United States.[14]  *See e.g.,* Decision Document, p. 6; 77 Fed. Reg. 10196.  "[L]oss of waters of the United States" is defined as "[w]aters of the United States that are permanently adversely affected by filling, flooding, excavation, or drainage . . . Permanent adverse effects include permanent discharges of dredged or fill material that change an aquatic area to dry land, increase the bottom elevation of a waterbody, or change the use of a waterbody." 77 Fed. Reg. 10289.

> The conversion of a forested wetland to a scrub shrub wetland does not constitute a permanent loss of waters of the United States, and thus does not count towards the acreage limit, even though it may result in the permanent loss of certain functions, which may require compensatory mitigation.

NWP 12, 77 Fed. Reg. 10196.

> Mechanized landclearing of a forested wetland in a utility right-of-way may only result in a conversion of wetland type, and not result in permanent loss of waters of the United States.  District engineers may require compensatory

---

[14] To the extent the Utility Intervenors argue that this issue was waived because Plaintiffs did not address the issue in their comments during the appropriate period for public notice and comment, the Court notes that "[s]everal commentors asked whether the conversion of a forested wetland to a scrub-shrub wetland counts toward the ½-acre limit." 77 Fed. Reg. 10196.  Accordingly, for the reasons set forth above, the Court concludes the issue was not waived.

mitigation to offset permanent losses of wetland functions when such mechanized landclearing occurs in forested wetlands.

*Id.* at 10195. The Corps reasonably determined that the conversion of wetland does not result in a loss of waters of the United States.

This issue was addressed by the court recently in *Ouachita Riverkeeper, Inc. v. Bostick*, --- F.Supp.2d ---, 2013 WL 1449710 (D.D.C. April 10, 2013)

> The distinction between loss of *function* and loss of *waters* is contained in the very definition of "loss of waters" set forth in the 2007 Reissuance of Nationwide Permits, which the Plaintiff does not challenge:
>
>> Loss of waters of the United States: Water of the United States that are permanently adversely affected by filling, flooding, excavation, or draining because of the regulated activity. Permanent adverse effects include permanent discharges of dredged or fill material that *change an aquatic area to dry land* . . . . The acreage of loss of waters of the United States is a threshold measurement of the impact of jurisdictional waters for determining whether a project may qualify for an NWP; *it is not a net threshold that is calculated after considering compensatory mitigation that may be used to offset losses of aquatic functions and services.*
>
> A.R. 209 (2007 Reissuance of Nationwide Permits)(emphasis added) The Corps employed this distinction in concluding that the pipeline project would not cause permanent loss of wetlands, but would convert forested wetlands to other wetlands "for which compensatory mitigation is necessary." A.R. 1162. The Plaintiffs offer no grounds on which the Court could conclude that the Corps' interpretation distinguishing between the loss of wetland function and the loss of waters is "plainly erroneous or inconsistent with the regulations being interpreted," thus that interpretation is controlling in this case. *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 171 (2007)(citations omitted).

*Id.* at*11.[15] As in *Ouachita Riverkeeper, Inc*, the Corps' interpretation of the conversion from

---

[15] The definition of "loss of waters of the United States" from the 2007 version when the NWP at
(continued...)

forested wetland to another type of wetland, which does not alter the usage of a body of water, is not arbitrary and capricious, and thus Plaintiffs are not entitled to judgment on this basis.[16]

## Corps Deferral of Impact Analysis Violated NEPA

Related to their prior cumulative impacts argument, Plaintiffs contend that the Corps violated NEPA by deferring such analysis.  Citing to 77 Fed. Reg. 10196, Plaintiffs contend that the provision that "cumulative effects of the overall utility line should be evaluated to determine if the adverse cumulative effects on the aquatic environment are more than minimal and therefore do not qualify for NWP authorization,"  indicates that the Corps deferred its cumulative impacts analysis.   Motion for Summary Judgment, p. 22 (citing 77 Fed. Reg. 10260).  Plaintiffs rely on *Defenders of Wildlife v. Ballard*, 73 F.Supp.2d 1094 (D.Ariz. 1999), wherein  the court considered whether the Corps had complied with NEPA in issuance of three NWPs.  The court considered whether the EAs were sufficient to fulfill the Corps' obligation to consider cumulative effects.  The court noted the repetitive nature of the NWPs, specifically that each assessment indicated the difficulty in predicting indirect impacts in light of the nature of nationwide permits, and the fact that the NWPs indicated additional assessment would be necessary on the project-level to ensure minimal adverse

[15](...continued)
issue in *Ouachita* was the same as that contained in the 2012 reissuance of the NWP.

[16] As noted by the Utility Intervenors, 33 C.F.R.  § 323.2(d)(2)(ii) provides that "cutting or removing of vegetation above the ground (e.g. mowing, rotary cutting, and chainsawing)" is not a regulated discharge if "the activity neither substantially disturbs the root system nor involves mechanized pushing, dragging, or other similar activities that redeposit excavated soil material."
.

impacts.  The court concluded the Corps had not fulfilled its obligations, because it deferred

a cumulative effects analysis, "conditioned on the modified NWP structure, which provided

that the impact analysis be conducted at the regional level.  This never happened."  *Id.* at

1112.

Plaintiffs also rely on *Wyoming Outdoor Council Powder River-Basin Res. v. U. S.

Army Corps of Engineers*, 351 F.Supp.2d 1232 (D.Wyo. 2005).  Therein the court considered

the Corps' issuance of an general permit to discharge dredge and fill material associated with

coalbed methane gas.  *Id.* at 1237.  The plaintiffs challenged the Corps' NEPA analysis,

asserting the Corps failed to consider cumulative impacts "to non-wetland resources, impacts

to water quality, impacts to private ranchlands, impacts to threatened and endangered species,

and impacts to wetland. . . . "  *Id.*  at 1238.  The court concluded the Corps violated NEPA,

because it failed "to consider the cumulative impacts of [the general permit].  The fact that

cumulative impacts were not discussed in relation to any resource other than wetlands,

necessitates the Court's conclusion that the Corps could not have found the cumulative

effects of GP 98-08 to be minimal in order to comply with the CWA."  *Id.*

Plaintiffs' also filed a notice of supplemental authority, espousing the position of the

court in *Kentucky Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402 (6th Cir. 2013).   The

*Riverkeeper* court addressed NWPs 21 and 30, both of which apply to mining activities that

discharge dredge or fill materials.  "Each cumulative-impacts analysis projected the permits'

respective environmental impacts before determining that compensatory mitigation would

reduce adverse impacts to a minimal level."  *Id.*  at 405.  With regard to both NWPs, a project

was required to pass a regional public interest requirement, and district engineers had to approve pre-construction notification. *Id.* In that case, however, the challengers specifically alleged the Corps failed to consider "the present effects of past permit authorizations." *Id.* at 406. In this case, however, the Plaintiffs challenge never references this particular requirement for the cumulative effects analysis.

Defendants contend the Corps, in the EA issued with NWP 12, conducted the requisite cumulative effects analysis, when it "considered many potential direct, indirect, and cumulative effects." Response, p. 22.

> [T]he EA discusses the affected environment by looking at national databases and types of waters. *Id.* (NWP3114-3118). The EA thoroughly discusses the current state of those waters with particular emphasis on water quality impairment and then looks at the causes and sources of impairment to waters. Id. (NWP3118-3120). The EA concludes that the activities authorized under NWP 12 will only minimally impair waters of the United States. *Id.* (NWP 3120, 3122-3123, 3128). The EA also evaluates various potential cumulative effects including activities authorized under past versions of NWP 12. *Id.* (NWP 3124-3129). Finally, the EA considers potential impacts on the economy, historic properties, fish and wildlife, flood hazards, land use, and water quality, among many other considerations. *Id.* (NWP 3129-3135).

*Id.* at 22-23. The EA concludes, in part, that "[m]ost causes and sources of impairment are not due to activities regulated under Section 404 of the Clean Water Act." Decision Document, p. 19. The Utility Intervenors similarly argue that the Corps did not defer its 404(e) minimal effects determination, noting that the NWP specifically indicates why activities authorized thereby will result in minimal individual and cumulative adverse effects on the aquatic environment, and "will not have a significant impact on the quality of the human environment." Utility Intervenor's Response at p. 24 (quoting Decision Document

p. 46).  The fact that certain actions require PCN does not mean that the Corps deferred this analysis, but rather the PCN process permits the Corps Districts to ensure that a particular project with have only minimal impacts.

The Decision Document states that "[t]he affected environment includes current aggregate effects of past action, which are captured in recent national information on the quantity and quality of wetlands, streams, and other aquatic resources that is summarized in Section 3.0." Decision Document, p. 23. It further concludes that "[t]he activities authorized by this NWP will result in minor contributions to the cumulative effects that have occurred to wetlands, streams, and other aquatic resources in the United States because, as discussed in this section, they are one of many activities that affect those resources."  Decision Document, p. 27.  The Court finds that the Corps did not defer its cumulative effects analysis to the District Engineer.  Although the District Engineer is charged with an additional layer of review with regard to projects for which pre-construction notification must be given, as argued by Defendants and Intervenors, such review is not improper deferral of NEPA analysis and the Corps decision in this regard was not arbitrary and capricious.

**The Corps Failure to Analyze the 1/2-acre loss Threshold Violated NEPA**

Plaintiffs argue the Corps erred because the Decision Document does not present any analysis to support its contention that the ½-threshold is minimal, and no discussion as to why the threshold could not be smaller.  The Utility Intervenors argue that this issue was waived, because Plaintiffs failed to take issue with the ½-acre threshold during the period of public comment.  There is no dispute that the issue was not raised by Plaintiffs, however, there were comments directed at the ½ acre threshold.

> One commenter stated that authorizing the loss of 1/2-acre of waters of the United States **for each crossing** results in more than minimal adverse environmental effects. Another commenter said that the 1/2-acre limit **should apply to the entire utility line project**, because the cumulative effects of the utility line must be considered. . . .  The 1/2-acre limit applies to each crossing that is considered to be a separate single and complete project, because they are sited at distant locations from other crossings that constitute the linear project.  Each separate and distant crossing should be evaluated to determine if it meets the terms and conditions of the NWP, and cumulative effects of the overall utility line should be evaluated to determine if the adverse cumulative effects on the aquatic environment are more than minimal and therefore do not qualify for NWP authorization. The "Definitions" section provides further clarification on single and complete projects.

77 Fed. Reg. 10196 (emphasis added).

The Court has reviewed the administrative record and agrees with the Intervenors' contention that the reasonableness of the ½ acre threshold, and whether that threshold should be lowered were not raised by any person or entity during the administrative process. Although commenters opined that the ½ acre should apply to whole projects rather than individual crossings, the Court finds no indication in the record that the issue of ½ acre versus a smaller threshold, the ½ acre having been adopted in 1991, was raised during the

administrative proceedings.   Accordingly, for the reasons set forth above, the Court concludes Plaintiffs' have waived their right to challenge this issue under NEPA.

### The Corps Was Required to Prepare EIS or EA for the Gulf Coast Pipeline

Plaintiffs next contend the Corps was required to prepare a separate EIS or EA for the Gulf Coast Pipeline, rather than relying on NWP 12, citing the requirement that federal agencies evaluate the impact of all "major federal actions."   *See* 42 U.S.C. § 4332(C). Plaintiffs argue the Gulf Coast Pipeline itself is a major federal action under 40 C.F.R. § 1508.18, separate and apart from any consideration of whether the project was subject to verification via the NWP process.  Plaintiffs additionally argue that the process of issuing the verifications required the Corps to comply with NEPA.  In their reply brief Plaintiffs note that in its PCN submissions, TransCanada listed nine federal agencies that could be involved in the Gulf Coast Pipeline, an indicator that construction of the pipeline is a major federal action for which the Corps was required to prepare at least an EA, if not an EIS.

Courts have identified three types of agency action that will typically constitute "major federal action. "First, where the agency itself undertook a project; second, where the agency supported a project by contract, grant, loan or other financial assistance; and third, where the agency enabled the project by lease, license, permit or other entitlement for use." *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236 (3rd Cir. 2012)(quoting *State of N.J. Dep't. of Envt'l Prot. and Energy v. Long Island Power Auth.*, 30 F.3d 403, 417 (3d Cir. 1994)).  The Gulf Coast Pipeline clearly does not fall within either of the first two categories, therefore leaving the Court only to consider the third.  However, the Court rejects Plaintiffs'

contention that the mere fact that verifications were necessary to allow construction of the Gulf Coast Pipeline to proceed, rendered this a major federal action mandating independent NEPA analysis.

As noted above, there are two types of § 404 permits, individual and general. Individual permits are subject to the requirements of the National Environmental Policy Act ("NEPA"). 33 C.F.R. § 325.2(a)(4). A general nationwide permit must undergo that extensive process at the time the permit is promulgated, not at the time an applicant seeks to discharge fill material under a general permit. *Id*. § 330.5(b)(3). In short, if in reissuing NWP 12 the Corps complied with NEPA, and if a particular verification was appropriate under NWP 12, no additional analysis was required under NEPA before TransCanada could proceed with the Gulf Coast Pipeline.[17]

Activities falling within the scope of an NWP are automatically authorized without any individualized inquiry, unless PCN to the Corps is required. *See* 33 C.F.R. § 330.1(e) (2003). To conclude that verification is itself a major federal activity, would render those portions of the NWP system that require PCN a complete nullity. As noted by the court in

---

[17]One commenter requested clarification that individual permits are not automatically required for NWP 12 activities when a Corps district participates as a cooperating agency for an environmental impact statement.

Even though an environmental impact statement may be prepared for a particular utility line, the National Environmental Policy Act process does not prohibit the Corps from using NWP 12 to authorize the construction, maintenance, repair, and removal of utility lines and associated facilities in waters of the United States, as long as the activity complies with all applicable terms and conditions and results in minimal individual and cumulative adverse effects on the aquatic environment.

Decision Document, p. 10.

*Sierra Club v. United States Army Corps of Engineers,* Case No. 13-cv-1239 (D.DC. November 13, 2013), "the entire point of the general permitting system  is to avoid the burden of having to conduct an environmental review under NEPA when a verification—as distinguished from an individual discharge permit— is sought." *Id.* at 26.  Furthermore, as argued by Defendants, the Corps does not control the actions of permit seekers; it may verify that a proposal falls within the scope of an NWP, and if not, the applicant must determine whether to proceed as planned by seeking an individual permit.  Or, it may amend its proposal to conform to recommendations made by the Corps or the contours of an NWP.

Alternatively, Plaintiffs argue that the cumulative federal involvement by multiple federal agencies in the Gulf Coast Pipeline means that the pipeline itself is a major federal action that required separate NEPA analysis.  However, the fact that other agencies may have oversight with regard to the pipeline once it is functioning does not render the project a major federal action under NEPA.

The Court finds Plaintiffs' reliance on *Spiller v. Walker*, 1998 U.S.Dist.Lexis 18341, No. A-98-CA-255-SS (W.D.Tex. Aug. 25, 1998), is misplaced.  In *Spiller*, the court referenced the project proponent's application for a nationwide permit under § 404 of the CWA, authorizing a pipeline to cross waters, without discussion of the NWP system or the idea of verification versus individual permitting.  Thus, the court's decision in that case that the Corps' involvement constituted major federal action, was not based solely on verifications requested from the Corps.  Rather, the pipeline company had requested an easement across Fort Bliss, requested that the Corps issue a general permit under Section 10 of the Rivers and

32

Harbors Act, and nationwide permits for certain unspecified water crossings. The court characterized the case as one involving several permit requests from the Corps, and the need to obtain permits from other federal agencies. *Id.* at *37. In this case, however, there is no record evidence regarding the involvement of other agencies in the permitting process, beyond the evidence Plaintiffs presented regarding the original Keystone XL Pipeline, which is not this action.

The major federal action in this case that mandated creation of an EA or EIS was NWP 12. As such, it was not arbitrary and capricious for the Corps not to complete either with regard to the Gulf Coast Pipeline.

The Court also rejects Plaintiff's argument that because similar pipelines were considered major federal actions, the Gulf Coast Pipeline necessarily is one as well. First, the fact that other major pipelines were planned outside the parameters of the NWP system does not render the verifications by the Corps in this case de facto arbitrary and capricious. Furthermore, the originally proposed Keystone XL EIS pipeline was to cross international boundaries, requiring prior approval in the form of a presidential permit processed by the Department of State. *See* Executive Order 11423 (authorizing the Secretary of State as designee to receive applications for permits for the construction at the borders of the United States of pipelines for consideration of whether issuance of the permit will serve the national interest). The Enbridge pipeline cited by Plaintiffs crosses the U.S.-Canadian border. The pipeline at issue herein, however, does not. Furthermore, the pipeline at issue in *Wilderness Workshop v. U.S. Bureau of Land Mgmt.*, 531 F.3d 1220 (10th Cir. 2008), was an attempt by

plaintiffs to preclude construction through a national forest, for which the putative permittee sought a permit from the BLM, which was required to undertake an individualized NEPA analysis, because there was apparently no general or categorical exclusion option. In this case, however, there is no contemplation of receipt of one or more individual permits, because the Corps has verified that the Gulf Coast Pipeline falls within the scope of NWP 12, and so long as the pre-issuance NEPA analysis for NWP 12 was sufficient and the verifications not arbitrary and capricious, Plaintiffs' cited cases simply do not apply, and Plaintiffs have failed to establish that the Corps was arbitrary and capricious in failing to conduct an EA or EIS with regard to the Gulf Coast Pipeline.

## Corps Proper Lead Agency

Plaintiffs argue the Corps is the proper lead agency for a NEPA analysis of the entire Gulf Coast Pipeline project. Consistent with the above arguments, Plaintiffs argue that if the Gulf Coast Pipeline or verification thereof pursuant to NWP 12 by the regional offices constitutes major federal action, and if the Corps is the lead agency, that any NEPA analysis must include the entire project. There is no dispute that the Corps did not conduct an independent EA or EIS for the Gulf Coast Pipeline, and the fact that it might be an appropriate lead agency is not an argument in support of a finding that the Corps violated NEPA or the APA. Because no EA or EIS was required, its potential to serve as lead agency is irrelevant.

## Regulations Required Consideration of Entire Project in NEPA Analysis

Plaintiffs argue the Corps was required to conduct additional NEPA analysis during

the process of verifying the Gulf Coast pipeline.  Citing 33 C.F.R. § 325 App. B, Plaintiffs argue that the Corps' regulations required that it analyze "the impacts of the specific activity requiring a [§404] permit and those portions of the entire project over which the district engineer has sufficient control and responsibility to warrant Federal review."  Intervenor TransCanada argues that the major federal action triggering NEPA with regard to these projects was reissuance of NWP 12, and that the three verifications themselves did not constitute major federal actions, and therefore the Corps was not required to conduct additional NEPA analysis.  Response of TransCanada, p. 12-14.

As noted by the court in *Kentuckians for the Commonwealth v. U.S. Army Corps of Engineers*, --- F.Supp.2d ---, 2013 WL 4516774 (W.D.Ky. 2103), "the fact that the Corps' § 404 permit is central to the success" of an overall project "does not itself give the Corps 'control and responsibility' over the entire fill."  *Id.* at 10 (quoting *Aracoma Coal,* 556 F.3d 195.  Adopting Plaintiffs' position would render the entire NWP program superfluous in any instance where PCN is required.  If a project identified in a PCN falls within the parameters of the specific NWP, the NEPA analysis conducted by the Corps when the NWP was reissued is sufficient.  If the proposed project does not fall within the confines of the NWP, the project requires modification or individual permitting to proceed.  *See Crutchfield v. U.S. Army Corps of Engineers*, 154 F.Supp.2d 878, 904, n., 14 (E.D.Va. 2001)("The Corps conducts the environmental analysis required under NEPA for NWPs prior to the issuance of the NWP in the Federal Register, rather than in connection with verification of NWPs for

a given project.")(citation omitted).[18]

Again, the cases cited by Plaintiffs are not dispositive.  In *Winnebago Tribe of Nebraska v. Ray*, 621 F.2d 269 (8th Cir. 1980), the court considered the propriety of an individual permit issued under the Rivers and Harbors Appropriation Act, after preparation of an EA by the Corps for a river crossing that comprised 1.25 miles of a 67-mile transmission line.  The court concluded the Corps did not have control over the project so as to require it to study the entire project.  *Id.*  at 273. Notably, the court did not establish any baseline for determining control based on the number of water crossings or the relative length of any particular project.  In *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113 (9th Cir. 2005), the court considered an individual permit, and thus was not considering the  limited issues implicated during verification of a project under the NWP system.  Similarly , in *White Tanks Concerned Citizens, Inc. v. Strock*, 563 F.3d 1033 (9th Cir. 2009), the court was dealing with an individual § 404 permit.  If the Court were to conflate the concept of issuing

---

[18]     The Conservation Groups' concerns, while certainly not trivial, ignore Category 13's own limitations. Each dead timber salvage project proposed under Category 13 will have different environmental consequences, some of which could pose the risk of significant environmental impacts. For example, one proposed project could significantly impact federally listed threatened or endangered species, flood plains, research natural areas, etc., while another proposed project could, in fact, involve the intense harvest of a large (e.g., 240 acre) densely populated timber area. Yet, both scenarios are adequately addressed by Category 13's own requirement that the Forest Service consider whether extraordinary circumstances are present that would preclude its use, see 68 Fed. Reg. 44,599, and we must presume that the Forest Service will act properly in applying it. *See, e.g., Sullivan v. Everhart*, 494 U.S. 83, 94, 110 S.Ct. 960, 108 L.Ed.2d 72 (1990).
*Colorado Wild, Heartwood*, 435 F.3d at 1220 (concluding Forest Service had not erred in limiting Category 13 Categorical Exclusion by acreage rather than the total volume of timber removed, or some other hybrid method).

an individual permit with verification of PCN under the NWP system, the Corps could be stymied from ever issuing a verification without completing an entirely new NEPA analysis for the individual project.

Defendant argues, and the Court agrees, that the fact that the entire Gulf Coast Pipeline will result in a total area of fill of less than one acre, supports their argument that the entire project cannot be recharacterized as a major federal action, so as to remove it from the confines of the NWP system.  In *Wetlands Action Network*, the court noted that the fact that the Corps has jurisdiction over a "small segment" of a project does not create "'control and responsibility' over the rest of the project sufficient to federalize the entire project."[19] 222 F.3d at 1115-18.[20]  The Court finds that it was not arbitrary and capricious for the Corps

---

[19] In *Wetlands Action*, the Corps granted a permit to fill a total of  16.1 acres of wetlands, and to mitigate the fill by creating a 51-acre freshwater wetland system.  *Id.* at 1109.  The work was to be done in support of a projected that was ultimately to cover more than 1,000 acres, divided into three separate phases.

[20]        Typical factors to be considered in determining whether sufficient "control and responsibility" exists include, whether the
            (I) Whether or not the regulated activity comprises "merely a link" in a corridor type project ( e.g., a transportation or utility transmission project).
            (ii) Whether there are aspects of the upland facility in the immediate vicinity of the regulated activity which affect the location and configuration of the regulated activity.
            (iii) The extent to which the entire project will be within Corps jurisdiction.
            (iv) The extent of cumulative Federal control and responsibility.
33 C.F.R. Part 325, Appendix B § 7(b).
The regulation provides examples regarding federal control over a corridor project, indicating that with regard to a 50-mile electrical cable crossing a 1 and 1/4 mile wide river, the Corps' consideration would be limited to the crossing.  The converse, that is if 30 miles of a 50-mile transmission line crossed wetlands or waters of the United States, that the Corps' scope should consider the impact of the entire line.  *Id.*  The parties do not inform the Court regarding the total mileage of crossings over the 479-mile pipeline, making reliance on either example impossible.

(continued...)

not to consider the entire project in a single NEPA analysis.

### NWP 12 Decision Document Insufficient for Gulf Coast Pipeline

In this section of their briefs Plaintiffs do not set forth an argument, but rather attempt to distinguish an authority previously cited by Defendants. *See* Motion for Summary Judgment, p. 29. Plaintiffs contend *Snoqualmie Valley* is not an appropriate authority to rely upon, because there, unlike here, the appropriate NEPA process had been undertaken by the Corps at the time of issuance of the NWP. *Id.* at p. 30. Defendant responds by again asserting that it does not have sufficient control and responsibility over the entire project so as to federalize it. Reponse to Motion for Summary Judgment, p. 39. To the extent this section of the brief can be construed as an argument, the Court finds that the failure to conduct additional NEPA analysis beyond the verification of minimal cumulative impacts in conjunction with the verifications was not arbitrary and capricious as set forth above.

### All Parts of Gulf Coast Pipeline are "Connected Actions" Which should be Analyzed in a Single EIS

Plaintiffs argue the Corps' verification of the Gulf Coast Pipeline under NWP 12 violated 40 C.F.R. § 1508.25, because the verifications were not assessed in a single NEPA document, because the individual components could only be analyzed separately if they would have independent utility. Plaintiffs contend the 2227 water crossings affiliated with the Gulf Coast Pipeline do not have independent utility, and thus all crossings should have been evaluated in a single document.

---

[20](...continued)

Defendants argue that because Congress did not specify how the Corps should determine minimal adverse impacts, that the Court may only consider whether the Corps' interpretation is "based on a permissible construction of the statute." *Chevron*, *U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984). As a result, Defendants assert that the Corps 1991 definition of "single and complete project," upon which it has relied since then, is entitled to deference. *Auer v. Robbins*, 519 U.S. 452, 461 (1997). Defendants argue that "[n]othing in Section 404(e) requires any limit on how many times an NWP can be used for a category of activities (let alone for an individual project) or how many "single and complete projects" can occur over an entire project." Response, p. 13. The Corps argues it has utilized the discretion granted to it by the CWA.

From the Court's perspective, the only requirement for entirely separate NEPA compliance with regard to the Gulf Coast Pipeline is if either the project or the verification thereof amounted to major federal action. If so, the Corps would have been required to complete an EIS, comporting with all of the requirements thereof, assuming it found the Gulf Coast Pipeline would significantly impact the human environment. As discussed *supra*, however, neither the Gulf Coast Pipeline nor verification thereof is a major federal action, and the Corps fulfilled its NEPA obligation at the time it reissued NWP 12, and thus, it was not required to complete a single EIS for the entire Gulf Coast Pipeline project. Accordingly, it was not arbitrary and capricious for the Corps to fail to issue a single EIS addressing the entire project.

## NWP Violates the Clean Water Act

39

As noted above, the CWA prohibits the discharge of pollutants, to include dredged or fill material, into waters of the United States, but authorizes the Corps to permit the discharge of pollutants via individual or general permitting.  A permittee need not seek an individual permit for a particular disposal site if the proposed activity falls within the conditions of a general permit.  33 U.S.C. § 1344(a).  Plaintiffs make the following arguments in support of their contention that reissuance of NWP 12 violated the CWA.

### NWP 12 Authorizes Activities with more than Minimal Impacts

Plaintiffs argue that NWP 12 violates the CWA, because NWP 12 authorizes activities that could have unlimited adverse effects on the environment, either individually or cumulatively, in violation of 33 U.S.C. § 1344(e).  Plaintiffs argue the Corps was required to ensure that NWP 12 would have minimal adverse effects on the environment as a whole, not merely on waters of the United States, and further contend that the definition of "single and complete linear project" which generally refers to each individual water crossing, permits the use of NWP 12 for projects that could have unlimited environmental impact.[21]

---

[21]    *Single and complete linear project*: linear project is a project constructed for the purpose of getting people, goods, or services from a point of origin to a terminal point, which often involves multiple crossings of one or more waterbodies at separate and distant locations. The term ''single and complete project'' is defined as that portion of the total linear project proposed or accomplished by one owner/developer or partnership or other association of owners/developers that includes all crossings of a single water of the United States (i.e., a single waterbody) at a specific location. For linear projects crossing a single or multiple waterbodies several times at separate and distant locations, each crossing is considered a single and complete project for purposes of NWP authorization. However, individual channels in a braided stream or river, or individual arms of a large, irregularly shaped wetland or lake, etc., are not separate waterbodies, and crossings of such features cannot be considered separately.

(continued...)

The Corps contends that under *Chevron*, NWP 12 is reasonable and consistent with the CWA, because Congress did not directly address in Section 404(e) of the CWA how the Corps "should determine the circumstances under which activities will have only minimal adverse individual and cumulative impacts. Thus, the only question for the Court is whether the Corps' determination is 'based on permissible construction of the statute,' which it is." Defendant's Response, p. 11-12 (quoting *Chevron*, 467 U.S. at 843). Defendants further argue that the longstanding definition of "single and complete linear project," that is calculating impacts separately for each separate and distant crossing, is entitled to deference. Defendant's Response at p. 12 (citing *Auer*, 519 U.S. at 461).

As set forth above, in 2012, the Corps "clarif[ied] that only losses of waters of the United States associated with a single and complete project would be considered when determining whether the acreage limit or pre-construction notification threshold is exceeded." Decision Document, p. 12.  "[W]e have clarified this in the definitions section by adding separate definitions that explain how single and complete projects are determined for linear and non-linear projects." *Id.*  As explained by Defendants, the definition for linear projects takes into account the fact that often "[s]eparate utility line crossings are . . . on different water bodies, and may also be in widely separated watersheds" diffusing their impact.

---

[21](...continued)
*Single and complete non-linear project*: For non-linear projects, the term ''single and complete project'' is defined at 33 CFR 330.2(I) as the total project proposed or accomplished by one owner/developer or partnership or other association of owners/developers. A single and complete non-linear project must have independent utility (see definition of ''independent utility''). Single and complete non-linear projects may not be ''piecemealed'' to avoid the limits in an NWP authorization.
77 Fed. Reg. 10290.

Response at p. 13 (quoting 77 Fed. Reg. 10,196).

Defendants persuasively argue that no provision of Section 404(e) of the CWA requires the Corps to limit the number of times a particular NWP may be used, requiring only that the Corps ensure both individual and cumulative adverse effect are minimal.  The Corps exercised its discretion in making this determination, assessing during the NWP 12 proceedings the impact of NWP 12, and the district engineers ensure on a case-by-case basis that the impact of work at a specific site or sites will have only minimal impact.  As such, Plaintiffs are not entitled to judgment on this basis.

## **Lack of an Independent Utility Test for Linear Projects**

As noted above, NWP 12 distinguishes between linear and non-linear projects, and only non-linear projects must have independent utility, meaning a project "would be constructed absent the construction of other projects in the project area." 77 Fed. Reg. 10289.[22]  Plaintiffs contend the lack of an independent utility test for linear projects is arbitrary and capricious, and permits piecemealing of projects to avoid acreage thresholds.

Defendants argue  that "applying the 'independent utility' test to linear projects would mean no individual crossing would ever qualify as a 'single and complete project' and, thus, every linear project would require an individual permit even when its overall adverse impacts were minimal."  Response to Motion for Summary Judgment, at p. 15.  Defendants further

---

[22]  "Portions of a multi-phase project that depend on other phases of the project do not have independent utility.  Phases of a project that would be constructed even if the other phases were not built can be considered as separate single and complete projects with independent utility."  77 Fed. Reg. 10289.

argue that its interpretation of "single and complete" projects is reasonable and consistent with the statute, because Congress has not directly addressed how the Corps should determine minimal adverse individual and cumulative impacts.  Accordingly, Defendants argue, the Court's review is limited to whether the Corps' determination is based on a permissible construction of the statute., and that nothing in § 404(e) limits how many times an NWP may be used or on how many single and complete projects can occur over an entire project.

Non-linear projects that are single and complete may not be piecemealed to avoid the limitations imposed by an NWP.  33 Fed. Reg. 10290.  As set forth above, with regard to non-linear projects, 'single and complete project' is the total project proposed or accomplished by one developer or partnership or other association of developers.  During the agency comment period preceding reissuance of NWP 12, the EPA expressed concern with the fact that a single NWP could be used multiple times for a linear project and advocating that the independent utility test be applied to linear and non-linear projects.  Defendant, Ex. 9, p. 11, NWP014924.  The Corps responded by noting that the definition had existed since 1991, that Districts continue to assess the cumulative effects of linear projects, and that "the independent utility test is intended primarily to prohibit piecemealing for phased development on a single site, or similar activities on a single site."  *Id.*

As noted by the Court in its order denying injunctive relief, the Corps sufficiently identified that non-linear projects, such as a substation, fulfill their purpose at a single site.  Plaintiffs, however, fail to establish that the independent utility test, and its application only

to non-linear projects, is unreasonable or that the difference in the impact of a linear versus non-linear project provides an insufficient basis to account for treating the two types of projects differently, so as to render the decision of the Corps arbitrary and capricious.

### NWP 12 Allows Unlimited Destruction of High-Quality Forested Wetland

`          Plaintiffs argue that the Corps' finding that the destruction of forested wetlands under NWP 12 would be only minimal was arbitrary and capricious.  Plaintiffs argue that the requirement for mitigation in the event that conversion results in the permanent loss of certain functions indicates that relying on NWP 12 for a project allows for unlimited wetlands destruction.

Defendants respond by arguing the Corps acted reasonably in concluding that conversion of forested wetlands is not "loss of waters of the United States."  noting the long-standing definition of "loss of waters of the United States," and that change in function is not tantamount to loss.  Citing to 77 Fed Reg. at 10289, the Corps explains that "when a wetland is converted, there is no *loss* of waters of the United States; the wetland and its waters still exist, they just become a different type."  Response, p. 16.  Defendants contend this interpretation is consistent with the Corps' regulations and is entitled to deference.

The Utility Intervenors assert that Plaintiffs' argument requires ignorance of the fact that the Corps' authority is limited to regulation of discharge of dredged or fill material, and that the cutting of trees or vegetation within a wetland without attendant discharge or dredge is not a matter for the Corps' concern, a rule unchanged since 1991.  The Utility Intervenors further note that a PCN is required whenever mechanized landclearing will occur in a

forested wetland, permitting the Corps to ensure that the individual and cumulative impact of any such clearing is minimal.

This same issue was recently addressed by the court in *Ouachita Riverkeeper, Inc. v. Bostick*, 938 F.Supp.2d 32 (D.D.C. 2013).  "The distinction between loss of *function* and loss of *waters* is contained in the very definition of "loss of waters" set forth in the 2007 Reissuance of Nationwide Permits, which the Plaintiffs do not challenge."  *Id.* at 45.  "The Plaintiffs offer no ground on which the Court could conclude that the Corps' interpretation distinguishing between loss of wetland function and the loss of waters is 'plainly erroneous or inconsistent with the regulations being interpreted,' and thus that interpretation is controlling in this case."  *Id.* at 46 (quoting *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 171 (2007)(citations omitted)).  This Court concludes, following the *Ouachita* court, that the Corps reasonably determined that the conversion of forested wetlands to another type of wetland is not loss of waters of the United States.

## NWP 12 Violates 404(e)- Lack of Minimal Effects Determination

Plaintiffs argue that the minimal effects determination for NWP 12 was not made as required by 33 U.S.C. § 1344(e), permitting unlimited impacts and improperly deferring to the Corps' district staff the ability to make case-by-case determinations.  Plaintiffs contend this procedure violates the Corps' regulations, specifically 40 C.F.R. § 230.7(b), which requires that such evaluation be completed before any general permit is issued.  Defendants argue the NWP 12 minimal effects determination complies with the CWA, and that it would be impossible to conduct a final and complete minimal effects determination for any

45

particular project under the NWP structure.

As noted above, 33 U.S.C. § 1344(e)(1) permits the Corps to issue a general permit only if the Secretary determines that the activities permitted by the general permit are similar in nature and will cause only minimal adverse environmental effects separately, and cumulatively.  Plaintiffs argue the subsequent case-by-case method runs afoul of Congressional intent, and that NWP 12 as reissued does not guarantee that a minimal effects determination will actually be made, because not every project requires PCN to the Corps.

The court in *Ohio Valley Envtl. Coal. v. Bulen*, 429 F.3d 493 (4th Cir. 2005), addressed a similar issue with regard to a version of NWP 21, a surface mining general permit.  The district court concluded the NWP violated the "unambiguous terms of section 404(e) because it allow[ed] the Corps to defer the statutorily-required minimal-environmental-impact determinations until after issuance of the nationwide permit." *Id.* at 498-99.  On appeal the court stated:

> First, section 404(e)(2) gives the Corps authority to revoke or modify a general permit if, after issuing the permit, it "determines that the activities authorized by such general permit have an adverse impact on the environment."  33 U.S.C. § 1344(e)(2).  This provision demonstrates that Congress anticipated that the Corps would make its initial minimal-impact determinations under conditions of uncertainty and that those determinations would therefore sometimes be inaccurate, resulting in general permits that authorize activities with more-than-minimal impacts.  It also demonstrates that Congress expected that the Corps would engage in post-issuance policing of the activities authorized by general permits in order to ensure that their environmental impacts are minimal.
>
> Second, it is impossible for the Corps' *ex ante* determinations of minimal impact to be anything more than reasoned predictions.  Even under the paradigmatic general permit envisioned by the district court, where the

46

parameters of the authorized activities are delineated in objective, measurable terms, the Corps' minimal-impact determinations would necessarily be a forecast only.  This is so because the environmental impact of the activities authorized by a general permit depends on facts that, as a practical matter, are outside the Corps' ability to predict with certainty *ex ante*.  This is especially acute when the Corps issues a *nationwide* permit like NWP 21 because the Corps must attempt to forecast the environmental effects the authorized activities could have if undertaken anywhere in the country under any set of circumstances.

*Id.* at 500-501.  The court concluded that the CWA is silent on whether the Corps may rely on post-issuance procedures to ensure that the impact of activities will truly be minimal.  *Id.* "[G]iven the inevitable *ex ante* uncertainty the Corps confronts when issuing  a nationwide permit, its reliance on post-issuance procedures is a reasonable, if not the only possible way for it to cement its determination that the projects it has authorized will have only minimal environmental impacts."  *Id.* at 501 (footnote omitted).

The Court finds here, as in *Bulen*, that the Corps made the necessary minimal effects determination, it considered the public comments, the state of resources in the United States, and the impact of past uses of NWP 12.  Nothing in the Act "specifies how the Corps must make the minimal-impact determinations, the degree of certainty that must undergird them, or the extent to which the Corps may rely on post-issuance procedures in making them."  *Id.* at 500.  Section 404(e) does not require certainty at the outset that an NWP will not have more than minimal impacts, but properly permits for district level evaluation to ensure impacts are minimal.  The Corps' construction of the § 404(e) of the CWA is entitled to

deference, and the Court finds no basis for invalidating NWP 12 on these grounds.[23]

## **Gulf Coast Pipeline Verification Was Arbitrary and Capricious**

Plaintiffs next complain that the Corps failed to make the required minimal effects determination when it issued the three verifications affiliated with the Gulf Coast Pipeline. Defendants and Intervenors first argue that this claim was not raised in the Amended Complaint, and therefore cannot be pursued by Plaintiffs. The Court finds that Plaintiffs adequately pled such a claim, alleging that "none of the Corps' three verifications contained a cumulative effects determination as NWP 12 requires." Amended Complaint, ¶ 135. Accordingly, the Court finds that this issue is appropriately before the Court.

The Court considers Plaintiffs' arguments under the following standard.

The verification decision at issue here involves a determination that the proposed activity falls within the parameters of the Corps' regulations enacting the nationwide permits. We "must give an agency's interpretation of its own regulations controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Miller v. Cal. Speedway Corp.*, 536 F.3d 1020, 1028 (9th Cir.2008) (internal quotation marks omitted).

*Snoqualmie Valley*, 683 F.3d at 1161.

In reviewing the PCN for the proposed activity, the district engineer will determine whether the activity authorized by the NWP will result in more than minimal individual or cumulative adverse environmental effects or may be contrary to the public interest. For a linear project, this determination will include an evaluation for the individual crossings to determine whether they individually satisfy the terms and conditions of the NWP(s), as well as the cumulative effects caused by all of the crossings authorized by NWP. . . . When making minimal effects determinations the

---

[23] To the extent Plaintiffs complain they were not given a chance to object to verification of the Gulf Coast Pipeline under NWP 12, this argument lack merit. As noted by the court in *Colorado Wild, Heartwood,* 435 F.3d at 1119, "CEQ regulations do not . . . require public involvement in an agency's decision to employ a [categorial exclusion] once that [categorical exclusion] has been approved." *See also Bulen*, 429 F.3d at 504. Accordingly, because the Corps' minimal effect determination was sufficient in NWP 12, it was not required to give additional notice or take additional public comment prior to issuing verifications thereunder.

district engineer will consider the direct and indirect effects caused by the NWP activity.

77 Fed.Reg. 10287.

Defendants argue Plaintiffs fail to establish that the Corps' verification was arbitrary and capricious, noting the permanent loss of .68 acres of waters of the United States along the 485-mile pipeline. Defendants contend the Court cannot require that its cumulative effects determination be presented in any particular form, and that the decisions of the three Corps' offices identify and articulate the relevant criteria and the Corps' conclusion that the project met the criteria.

TransCanada similarly argues that the verification letters issued by the Corps' regional offices were not required to explicitly address cumulative impacts, citing an absence of any statutory or regulatory requirement that such analysis be addressed in verification letters. As such, TransCanada contends the Memorandum for Record prepared by each of the three Corps Districts sufficiently commemorates a minimal effects determination. See TransCanada's Ex. 4 (SWG01_482-85); Ex. 5 (SWT_4276-79); Ex. 20 (SWT_4284); Ex. 6 (SWF_10593-96).[24]

As noted by Defendants and TransCanada, there is no statutory or regulatory dictate outlining the requirements of a verification letter, and the Court may not substitute its judgment for that of the agency. *See FCC v. Fox Television Stations, Inc.* 556 U.S. 502, 513 (2009)("a court is not to substitute its judgment for that of the agency, and should uphold a decision of less than ideal

---

[24] The Memorandum for Records indicate that the proposed crossings along the projects were evaluated. For example, the Fort Worth District's Memorandum for Record indicated that "[a]ll proposed crossings have been evaluated relative to the definition of single and complete project for linear projects." Defendants' Ex. 12, SWF010578. The Memorandum from the Fort Worth District indicates that TransCanada was required to provide "rationale and description for determining crossings relative to the definition of *single and complete linear projects* as found in the 2012 reissuance of the Nationwide Permits. The applicant provided revised maps and tables clarifying the single and complete crossings." Defendant Ex. 12, SWF010580.

clarity, if the agency's path may reasonably be discerned.")(citations omitted)(internal quotation marks omitted)(quoted in *Snoqualmie Valley*, 683 F.3d at 1163).   The court in *Snoqualmie Valley* concluded:

> The Verification letter at issue herein does state reasons for the action taken: the agency verified that [project] could proceed under section 404 of the CWA because the project had minimal individual and cumulative impacts and it complied with all terms and conditions of NWPs 3, 33, and 39.  This conclusion is amply supported by the facts in the administrative record.  To require more would be contrary to the regulatory scheme, which devised the systems of general nationwide permits to streamline the process, reduce redundancy, and conserve agency resources.  33 C.F.R. § 330.1(b) (Nationwide permits . . . are designed to regulate with little, if any, delay or paperwork certain activities having minimal impacts.").

683 F.3d at 1163.

TransCanada presented the Corps with wetlands delineations, setting forth each crossing, the location and aquatic features thereof, the type of construction anticipated, as well as expected impact.  The Corps indicated it made field visits to numerous sites to verify the accuracy of the information provided by TransCanada.  Additionally, there is record evidence that the Corps' offices consulted with one another during the verification process and sent their information to Corps' headquarters.  Issues addressed included whether certain crossings should be considered single and complete or whether they should be joined for purposes of determining the impact on acreage.  The verification letters identified the appropriate criteria and determined they were met. *See City of Colorado Springs v. Solis*, 589 F.3d 1121, 1134 (10th Cir. 2009)(terse denial sufficient for judicial review).  The Court concludes the Corps reasonably determined that the Gulf Coast Pipeline as presented by TransCanada had only minimal effects, both individually and cumulatively, and therefore, Plaintiffs are not entitled to relief on this basis.[25]

---

[25] This case differs from *Maryland Native*, cited by Plaintiff, in part because of the structure of the
(continued...)

## Individual Crossings Exceed ½ -Acre of Loss

Plaintiffs complain that individual crossings exceed the ½-acre of permissible loss, and therefore, the Gulf Coast Pipeline was ineligible to proceed under NWP 12.  Plaintiffs argue that the conversion from forested to scrub shrub wetlands will result in conversion of over 10 acres, far in excess of that permitted by NWP 12.  Defendants contend Plaintiffs' are incorrect, because again, the conversion of forested wetland to another type of wetland is not permanent loss of waters of the United States, and the total permanent loss will be .68 acres.  TransCanada argues that Plaintiffs ignore the requirement imposed by the Corps that TransCanada purchase credits from mitigation banks or  purchasing and preserving wetlands where no mitigation bank is available.

As argued by Defendant and TransCanada, the Court concludes, as it did above, that the Corps' determination that the conversion of forested wetlands is not the loss of waters of the United States was not arbitrary and capricious, and therefore, Plaintiffs not entitled to relief on this basis.

## The Corps Failed to Coordinate with Other Agencies

Plaintiffs argue the Corps verified the Gulf Coast Pipeline without coordinating with other agencies, allegedly required by General Condition 31(d), applicable to all NWPs.    General Condition 31(d), 77 Fed.Reg. 10287, provides:

> The district engineer will consider any comments from Federal and state agencies concerning the proposed activity's compliance with the terms and conditions of the NWPs and the need for mitigation to reduce the project's adverse environmental effects to a minimal level.

---

[25](...continued)
permit system at issue therein.  In *Maryland Native,*, the project was proceeding under a statewide general permit.  That permit system had a different structure, and certain of the categories of discharge required public notice and comment under Maryland law.  332 F.Supp.2d at 849.  In determining that the Corps' reasoning was not sufficiently explained and that it could not rely on a letter from the Corps to the developer, the court relied in part on the fact that "[a]n agency's decision, especially one dealing with an issue that required public notice and comment, should be publicly available." *Id.* at 858.

General Condition 31(d)(2) provides a procedure whereby the district engineer provides information and a copy of any PCN to the appropriate federal or state officials, who have ten days in which to notify the district engineer of any intent to respond.

Defendants contend the Corps was not required to coordinate with other agencies by virtue of General Condition 31(d)(2), which prefaces the procedures for seeking comments:

> For all NWP activities that require pre-construction notification and result in the loss of greater than ½-acre of waters of the United States, for NWP 12, 29, 39, 40, 42, 43, 44, 50, 51, and 52 activities that require pre-construction notification and will result in the loss of greater than 300 linear feet of intermittent and ephemeral stream bed . . . .

*Id.* The Corps contends it was not necessary to coordinate with other agencies here because no linear project may proceed under NWP 12 if it results in the loss of greater than ½ acre of waters of the United States. Response to Motion for Summary Judgment, p. 35-36. Defendants argue the term "activities" refers not to an entire linear project, but rather to a "single and complete project," and therefore the cumulative impact of all permanent water losses for every single and complete project within a linear project does not require coordination. Only if a single water crossing resulted in a loss of more than 1/2-acre would coordination be required.

TransCanada adopts the position of the Federal Defendants and further argues that the Corps' position aligns with the structure of the NWP program, because NWPs are issued for categories of activities. With regard to NWP 12, the relevant "activity" is not the entire line, but rather each single and complete crossing. Decision Document at p. 6. General Condition 31(d) is not meaningless, because all NWPs, are subject to the General Condition, and certain of those do not have the same built in ½-acre threshold. TransCanada further argues that the interpretation espoused by the Federal Defendants is consistent with the history of the NWP program, evidenced by a 1991 explanation that inter-agency coordination was extremely burdensome.

52

> [S]everal commenters stated that the thresholds for agency coordination should be
> decreased. . . . One commenter suggested requiring agency coordination for NWP
> 12 activities, because they could result in the loss of greater than 1/2-acre of waters
> of the United States.
> We believe the agency coordination thresholds established in paragraph (d)(2) of this
> general condition are appropriate, and focus on those activities where it would be
> helpful to solicit the views of the listed agencies prior to making a decision on an
> NWP pre-construction notification. . . . The limits for NWP 12 apply to single and
> complete projects, and for each single and complete project the NWP 12 activity may
> not result in the loss of greater than ½-acre of waters of the United States.  As
> discussed elsewhere in this final rule, in response to pre-construction notifications
> for NWP 12 activities that are linear projects, district engineers will evaluate the
> cumulative effects of those linear projects on the aquatic environment when
> determining whether authorization by NWP is appropriate.  We do not believe it is
> necessary to require agency coordination for those linear projects.

77 Fed.Reg. 10260.

The Court concurs with Defendants' and TransCanada, that Defendants' interpretation of the

requirements of General Condition 31(d) was not arbitrary and capricious, and therefore, the Corps

was not required to coordinate with other federal agencies

### Motion to Supplement

Plaintiffs filed a Motion to Supplement [Doc. No. 139], seeking to submit evidence to the

Court regarding an oil spill in Arkansas on March 29, 2013.  In light of the Court's rulings set forth

above, the Court hereby DENIES Plaintiffs' motion.

### Notice of Clerical Error in Administrative Record

Following the filing of Plaintiffs' Reply brief in support of their Motion for Summary

Judgment, Defendants sought leave to supplement the record.  Specifically Defendants conceded

that in issuing the NWP verifications herein, that each of the regional offices relied on templates that

became outdated with the reissuance of the NWPs in 2012, just months before the verifications were

issued.  Specifically the verifications cite to the incorrect section of the General Conditions.

Because issues not raised in a motion are deemed waived, and because Plaintiffs did not raise this issue until their reply brief, the Court finds no basis for considering this particular aspect of Plaintiffs' contention regarding the verifications.  As such, there is no need to correct the clerical record, and Defendants' motion is therefore denied.

### Motion to Dismiss

On November 12, 2013, TransCanada TransCanada Keystone Pipeline, LP and TransCanada Corporation filed a motion to dismiss, asserting therein that Plaintiffs' claims are prudentially moot because the construction of the Gulf Coast Pipeline has been completed.  The Court finds that it need not determine whether the claims are prudentially moot as a result of the completion of the pipeline and any attendant fill, because the Plaintiff's claims fail on the merits. *See Hillsdale Environmental Loss Prevention, Inc. v. United States Army Corps of Engineers*, 702 F.3d 1156, 1167 (10th Cir. 2012).  As such, the Court hereby denies the motion to dismiss.

For the reasons set forth herein, the following motions are denied:

1.  Plaintffs' Motion for Summary Judgment [Doc. No. 106];

2.  Plaintiffs' Motion to Supplement [Doc. No. 139];

3.  Motion to Dismiss [Doc. No. 153].

IT IS SO ORDERED this 30th day of December, 2013.


*David L. Russell*

**DAVID L. RUSSELL**
**UNITED STATES DISTRICT JUDGE**

54